(Decided 21st December, 1883.)

R. C. JOHNSON, JAMES W. HURTT, and others *vs.* JESSE K. HINES, Assignee, and others.　N. PUMPHREY, Assignee of THOMAS PUMPHREY *vs.* HANNAH M. BLACKISTON, and others, devisees of JEMIMA NAUDAIN. HANNAH M. BLACKISTON, and others, devisees of JEMIMA NAUDAIN *vs.* S. HURLOCK and R. S. GRIFFITH. THE VISITORS AND GOVERNORS OF WASHINGTON COLLEGE, AT CHESTERTOWN *vs.* THOMAS S. WICKES.

*Execution—Statute of Limitations—Judicial sale—Unauthorized conveyance by Trustee—Void deed—Nullity—Irregularity—Equity practice—Vendor's lien—Rent payable by a portion of the Crop—Mortgage of the Moiety of a growing Crop—Corpus of the Estate—Paramount claim of Devisees—Mortgage as collateral Security—Merger—Potential right of Dower—Mortgage as Evidence of indebtedness.*

The mere issuing of an execution on a judgment within the period of twelve years from its date, interposes no bar to the operation of the Statute of Limitations.

Where a trustee appointed by a Court of equity to sell a farm, sells the same, and before the payment of the purchase money, and the ratification of the sale by the Court, executes a deed of conveyance to the purchaser, such deed is an absolute nullity and not a mere irregularity.

The distinction between an irregularity and a nullity is that the former may be waived, while the latter never can be waived.

Johnson, *et al. vs.* Hines, Assignee, *et al.*

Where a trustee, appointed under a decree to sell real estate, in violation of the terms of the decree, executes a deed to the purchaser before payment of the purchase money, the Court upon a proper presentation of the facts by petition, will treat the unauthorized conveyance as a nullity, remove the trustee and appoint another in his stead to make sale in conformity with the terms of the decree. A proceeding by a bill for the enforcement of the vendor's lien is not necessary.

Certain real estate known as "Davis' Industry" was sold by a trustee in equity, in order that the proceeds might be distributed among the devisees of J. N. Before the sale was ratified by the Court the trustee executed a deed to B. the purchaser. B. afterward, having become greatly embarrassed by his pecuniary obligations and by the pressing claims of creditors who had obtained judgments against him, executed a mortgage of several farms, including "Davis' Industry." Subsequently B. conveyed the same property in trust with power to sell, and apply the proceeds to the payment of the judgments, mortgages and other debts of the grantor. B. had leased "Davis' Industry," and in the lease it was stipulated that the rent was to be paid by the delivery to the lessor of a portion of the crop when severed from the soil. The lessor mortgaged his moiety of the crop to H. and G. in anticipation of the severance. Under the deed of trust the land was sold before the crop was severed. H. and G. claimed to have a lien on the fund arising from the sale to the extent of the value of the moiety of the crop sold with the land. HELD:

1st. That the growing crop was to be included in the *corpus* of the estate, and could not become the subject of a transfer anterior to its severance from the soil and its apportionment as rent due in conformity with the terms of the lease.

2nd. That the devisees of J. N. had a prior and paramount claim to the proceeds arising from the sale of "Davis' Industry," including the sum received from the crop adhering to the soil and transferred to the purchaser of the realty.

Where a party, against whom there exists a number of judgments which are barred by limitations, gives a mortgage as additional or collateral security for the payment of such judgments, they are not merged in the mortgage.

And the wife who joins with her husband in the execution of such mortgage is not entitled to any allowance for her potential right of

dower in the lands embraced in said mortgage, until the amounts due on said judgments and secured by the mortgage, have been fully paid.

Where the lien of a judgment secured by such mortgage has been lost by lapse of time, the mortgage is the only evidence of the indebtedness, and its date must determine the order of priority in which the claim is to be allowed.

APPEALS from the Circuit Court for Kent County, in Equity.

These appeals were taken from an order of the Circuit Court sustaining exceptions to the several reports of the auditor, and referring the case back to the auditor to state an account in accordance with the instructions accompanying the order. The case is stated in the opinion of this Court.

The cause was argued before *BARTOL, C. J., YELLOTT, MILLER, ALVEY,* and *IRVING, J.*

*D. J. Blackiston,* and *James E. Ellegood,* for Johnson, Hurt, and others.

*M. Bannon,* for N. Pumphrey, Hines, assignee, and others.

*James A. Pearce,* for the devisees of Jemima Naudain.

*J. B. Brown,* and *E. H. Brown,* for A. Hurlock and Griffith.

*Richard Hynson,* for the Visitors and Governors of Washington College, at Chestertown.

*Chief Judge BARTOL, though present at the hearing of this case, was prevented by sickness from participating in the decision.

*Henry C. Kennard,* for Thomas S. Wickes.

YELLOTT, J., delivered the opinion of the Court.

In the voluminous record transmitted to this Court are four appeals from an order of the Circuit Court for Kent County, sitting in equity; and some difficulty has been encountered in segregating from a mass of irrelevant matter the prominent and material facts upon which a proper solution of the questions in controversy is dependent. Some years antecedent to the pending litigation, by a decree of the Circuit Court for Kent County, in a cause in which H. Maria Blackiston and others were complainants, and Clara L. Blackiston and others defendants, D. James Blackiston was appointed trustee, and was directed to sell certain real estate situate in said county, consisting of about one hundred and fifty acres of land known and designated by the name of "Davis' Industry," in order that the proceeds from the sale, when made, might be distributed among the parties to the cause who were the devisees of a certain Jemima Naudain. On the 10th day of June, 1869, the trustee, so appointed, sold the said real estate to his father, D. C. Blackiston; but this transaction has never received the sanction of the Court by an order of ratification, nor has the purchase money ever been paid. The trustee, however, on the 21st day of January, 1870, executed and delivered a deed to the purchaser, in manifest contravention of the explicit terms of the decree, which inhibited the execution and delivery of a deed anterior to the payment of the purchase money.

The proof in the cause tends to establish the fact of the insolvency of the purchaser as well as that of the trustee, and the irresponsibility of their sureties. That a deed had been executed was, apparently, unknown to the devisees directly interested in said real estate until a number of years subsequent to its delivery to the purchaser; several of them testifying that they had no knowledge of the

fact until 1877. Soon after the discovery of this fact, on the 29th day of December, 1877, H. Maria Blackiston, and the other parties in interest, filed a bill, on the equity side of the Circuit Court for Kent County, against D. James Blackiston, the trustee, D. C. Blackiston, the purchaser, A. P. Gorman, and others, to enforce their alleged vendor's lien on the real estate sold by the trustee, and conveyed in the manner aforesaid. This suit was never prosecuted to decree, it appearing that, anterior to its institution, the said D. C. Blackiston, having become greatly embarrassed by his pecuniary obligations and by the pressing claims of his creditors, who had obtained a number of judgments against him, executed a mortgage, in which his wife joined, on all his real estate situate in Kent County, consisting of several farms, including "Davis' Industry," to Arthur P. Gorman, Wm. H. Bians, Charlotte Spencer, and Thomas Pumphrey, empowering said mortgagees, or their attorneys, M. Bannon, and Richard Hynson, to sell, upon default, after giving the prescribed notice. The same property was afterwards conveyed, by D. C. Blackiston and wife, to Richard Hynson, James A. Pearce and Michael Bannon, in trust, with power to sell and apply the proceeds from the sale to the payment of the judgments, mortgages and other claims against the said D. C. Blackiston in conformity with the legal principles applicable to the question of priorities. A sale was made under this deed ; the creditors of D. C. Blackiston assenting to the execution of the trust, and by an agreement filed in the cause all questions in relation to the claims of the devisees of Jemima Naudain are reserved for determination in the distribution of the fund thus created.

The auditor stated a number of accounts, in each, making a distribution of the proceeds from the sale in correspondence with the separate and distinct theories of the parties respectively. Exceptions were taken to each one of these accounts, which was sustained, the accounts re-

jected and the matters involved in controversy referred back to the auditor with directions to state an account in conformity with the instructions, accompanying the Court's order, and indicating the questions decided and brought by appeal, into this Court for revision.

To enter upon a detailed examination of the items in each one of these accounts would probably lead to an almost endless, and certainly to an exceedingly amplified and prolix investigation, and, as this cause must be remanded, it would seem that a concise exposition of the legal principles, forming the basis of the instructions given by the learned Judge in the Circuit Court, is all that is necessary for the guidance of the auditor in his future action.

The auditor was instructed to disallow the judgment of Harriet Tilghman, use of G. B. Westcott, use of Thomas Pumphrey, which was obtained November 21st, 1866; the judgment of the Mutual Fire Insurance Company, use of Thomas, use of N. Pumphrey, which was obtained October 19th, 1868; and the judgment of the Visitors and Governors of Washington College, which was obtained on the 11th day of May, 1868. These judgments were obtained in suits against D. C. Blackiston, more than twelve years anterior to the execution of the deed of trust under which his property was sold and the fund for distribution created. It was assumed that they were consequently barred by the Statute, and were not admissible as evidence of any indebtedness. *Rev. Code, Art.* 69, *sec.* 3.

It has been contended in argument that, on some of these judgments, executions had been issued antecedently to the expiration of the period of twelve years, and that a bar had thus been interposed to the operation of the Statute. This question was determined in the case of *Mullikin vs. Duvall,* 7 *G. & J.,* 355 ; the Court there deciding that a judgment could not be revived by *scire facias* subsequently to the lapse of the statutory period of twelve

years, and that an outstanding execution levied on lands which remained unsold, did not form an exception to the Act of Limitation, which commenced to operate from the date of the recovery of a judgment. A judgment might be kept alive and in full legal operation for an indefinite period, by issuing an execution upon it within three years (or now under the provisions of the Act of 1874, it would seem within twelve years,) and by renewing such execution from term to term, but if it has not been regularly continued, and a *scire facias* should become necessary, the computation of the time of limitation would commence from the date of the judgment, or from the term of the Court when the process of execution could have been legally issued. "The English mode is, to issue one execution, procure it to be returned and filed, and afterwards continue it to the time when a real execution is wanted, by fictitious entries on the record which are not made until they are required to be used. The Maryland mode is to renew the execution every Court by an order to the clerk to issue an execution to lie. The clerk does not really issue any execution upon this order; but makes the same entry on his docket as if he did; adding only on the margin by way of remark the words 'to lie.'" *Evans' Pr.*, 66.

The judgment of the Mutual Fire Insurance Company, of Kent County, was not barred by limitation, as was supposed by the Circuit Court, there having been a stay of execution for one year. It should, therefore, have been admitted in the order of its priority to be determined by its date.

The mortgage from D. C. Blackiston and wife to A. P. Gorman and others, is shown, by the evidence in the cause, to have been taken as an additional and, as was supposed, a better security for claims on which judgments had already been obtained. Referring to the mortgage, Mr. Bannon, in his testimony, says: "It pledged, besides Mr.

Blackiston's interest, his wife's potential right of dower; it rendered the property more saleable, by including the whole title, and stating definitely the indulgence Mr. Blackiston was to receive on the prior judgments and decrees, and rendered the debt, due on the assignments, more readily collectable, and made the security more valuable for both borrower and lender."

The Circuit Court treated this mortgage as collateral security for the judgments named in said mortgage, and which are barred by limitation. The principle on which this ruling is founded cannot be controverted. A creditor may be so fortunate as to obtain more than one security for the payment of money due him, and if one fails him, because of the operation of the Statute of Limitation, by no process of ratiocination, based upon judicial authority, can it be made to appear that the other is necessarily extinguished. It is true that there can be but one satisfaction of the debt, but the evidence of its existence may be multiform. There was, therefore, no error in the Court's ruling on this point, nor in the determination which seemed to follow in logical sequence, that the wife of D. C. Blackiston, who had joined with her husband in the execution of the mortgage, should not receive any allowance for her potential right of dower in any of the lands embraced in said mortgage, until the amounts due on said judgments and secured by said mortgage had been paid in full.

The judgment of Hurlock, use of Spry, designated among the claims as No. 8, and being part of a judgment against W. T. Spry, as a co-defendant and surety for D. C. Blackiston, has not been allowed, as no copy of this judgment was among the papers submitted to the Court. The Circuit Court decides that "if the judgment was obtained against Spry as a surety of Blackiston, and Spry has paid the same, or any part thereof, then the claim should be allowed to the extent of said payment, accord-

ing to the priority of the judgment, unless the lien has been lost by lapse of time or otherwise." There is no error in this determination, and it furnishes a correct rule for the guidance of the auditor in stating an account.

The auditor, in one of the accounts stated, has distributed the proceeds from the sale of the tract of land called "Davis' Industry" among the devisees of Jemima Naudain, in satisfaction of what has been termed in these proceedings their vendors' lien. The Circuit Court rejected this account because of other inaccuracies, but sustained the claim of these devisees to the special fund arising from this source, and directed the auditor to allow it in restating his account.

The trustee having acted in contravention of the terms of the decree, an effectual remedy need not have been sought for, by a bill in equity, for the enforcement of a vendor's lien. Upon a proper presentation of the facts by petition, the Court could have treated the unauthorized conveyance to D. C. Blackiston as a nullity; could have removed the trustee; appointed another fiduciary agent in his stead, and directed him to make sale in conformity with the terms of the decree.

It has been urged in argument that, although the sale was not ratified, the ratification of the auditor's account was tantamount to a waiver of the objection. This position is not tenable; for it is a recognized principle that there can be no waiver of a nullity. There is a marked and important distinction between nullities and irregularities. An irregularity may be waived; a nullity never can be waived. In *Holmes vs. Russell,* 9 *Dowl.,* 437, Coleridge, J., says:

"It is difficult sometimes to distinguish between an irregularity and a nullity, but I think the safest rule to determine what is an irregularity and what is a nullity is to see whether a party can waive the objection. If he can waive it, it amounts to an irregularity; if he cannot, it is a nullity."

This principle, in its application to irregular and null proceedings, is recognized and acted upon in the Courts of Chancery. *Daniel's Ch. Pr.,* 304. It must be apparent that, in legal contemplation, the act of a trustee in undertaking to execute a deed of conveyance before the Court had consummated the sale by its ratification, is as absolute a nullity as, in an action at law, would be the issuance of an execution in anticipation of the rendition of a judgment. The improvident ratification of an auditor's account could not, therefore, be construed to be a waiver of that which was in its inception and finality, essentially and absolutely null and void.

As by an agreement filed in this cause, the devisees of Jemima Naudain have consented to look to the fund created by the sale of the tract of land called "Davis' Industry" for the satisfaction of their claim, it becomes necessary to analyze the title of D. C. Blackiston to this particular portion of the real estate conveyed by deed of mortgage to A. P. Gorman and others. He derived his title, if any he had, from the unauthorized conveyance of the trustee. Even in the case of a conventional trust, if the trustee goes beyond the scope of the power conferred by the deed or other instrument creating the trust, a Court of equity will declare his acts to be *ultra vires* and legally inoperative. But in the case now under consideration the Court was the vendor, making a contract of sale through its agent, the trustee, and no sale could be consummated unless it had been judicially sanctioned and ratified. The unauthorized deed of the trustee could convey no title to the purchaser, who, therefore, acquired no seizin in the land by its delivery. That nothing can emanate from nonentity or, as more tersely enunciated, *de nihilo nil,* is an axiom in the physical sciences which might be appropriately transferred to a judicial investigation of this nature. If D. C. Blackiston had no title he could convey none by way of mortgage or otherwise. It may be safely

asserted, as being beyond the scope of controversy, that, if the Court, treating the sale as a nullity, had appointed another trustee, whose sale was ratified and a deed given, the purchaser under it would have acquired a paramount title. And if, after the delivery of the deed, a grantee of Blackiston had entered and held possession, on what ground would he have stood in an action of ejectment for the recovery of the premises instituted by the purchaser at the sale which had received the sanction of the Court by its order of ratification? Without a shred of title he would have been ejected and held liable for the *mesne* profits.

The question in relation to the validity of the bill of sale, by which the growing crop was transferred, is now to be considered. After a determination of the title in favor of the lessor of the plaintiff, in the old action of ejectment, he could institute an action for the recovery of the *mesne* profits. The Act of 1872 has simplified the proceedings, and the plaintiff can now, in the same action, recover the premises and the *mesne* profits. D. C. Blackiston had leased the tract of land called "Davis' Industry," to one John Scotten; and by the terms of the leasing it was stipulated that the rent was to be paid by the delivery to the lessor of a portion of the crop when severed from the soil. The lessor mortgaged his moiety of the crop to Hurlock and Griffith in anticipation of the severance. Under the deed of trust the land was sold while the crop still adhered to the soil, and the mortgagees now claim that they have a lien on the fund created by the sale, to be measured by the value of Blackiston's moiety of the wheat crop thus sold with the land.

This case presents a very different aspect from one originated by a bill in equity for the enforcement of a vendor's lien against a purchaser who has entered in good faith and by legal right, but who has subsequently become delinquent in relation to the performance of his pecuniary

obligations. As D. C. Blackiston had no title to the land it is difficult to perceive how he could execute a valid lease or a mortgage of the crops. As has been already intimated, had he been ejected in a suit at law; the value of these crops could have been recovered in an action for *mesne* profits. The will of Jemima Naudain vested the legal title in her devisees, and not by their act has that title been transferred. When there has been a transmutation of the *corpus* of the estate, and it has been converted into money, it follows, that unless a Court of equity is hedged in, embarrassed, and fettered by more rigid and inflexible rules than those which are permitted to control the judgments of other tribunals, it will not only recognize the validity of the claim of those, who were the legal owners of the estate, to the funds created by its sale ; but having once acquired jurisdiction, will decree as full, ample and adequate relief as could have been obtained by the institution of an action in a Court of law.

But on other and distinct grounds it must be held that the growing crop is to be included in the *corpus* of the estate, and could not become the subject of a transfer anterior to its severance from the soil, and its apportionment, as rent due, in conformity with the terms of the lease.

In *Comyn* on *Landlord and Tenant, page* 226, it is said that, "When the lessor, being tenant in fee, or in tail, dies, *after* the rent has become due, it will be payable to his executor ; if he die *before* it becomes due, to the heir or remainder-man."

In the case of *Martin vs. Martin,* 7 *Md.,* 375, the Court said, "There can be no doubt that the assignee of a reversion is entitled to the rent falling due after the assignment, where there is no reservation of the rent ; the reason whereof is that the rent is incident to the reversion, and passes away by the grant of the reversion."

In the case just cited the lessor, before any rent was due, drew two orders on his tenant, the defendant in the cause,

in favor of the plaintiff; which orders were accepted. Before the rent became payable the land was sold under an execution on a judgment obtained against the lessor. The tenant was subsequently sued on his acceptances, and the Court decided that the plaintiff was not entitled to recover. The learned Judge, who delivered the opinion of the Court, says:

"We do not perceive that the plaintiff, as assignee of so much of the rent, occupies any better position, as against the purchaser, than the landlord himself would, if these orders had not been given. He must be presumed to have had knowledge of the judgment, and of its legal consequences if enforced. The defendant, in a judgment binding his lands, cannot create liens to the prejudice of the plaintiff. All persons, dealing with him in reference to the land, acquire rights, if any, in subordination to the judgment lien. It cannot be maintained, that a debtor so situated, may, by making a lease, and anticipating the payments of the rent, affect the value of the plaintiff's security for his debt."

It is clear that the question, invoking a solution in this cause, has already been determined by the authority just cited, and that the mortgagees, Hurlock and Griffith, acquired rights, if any, in subordination to the lien of the devisees of Jemima Naudain. The Court below therefore erred in its instructions to the auditor to allow their claim, to the exclusion of the rights of said devisees.

It now becomes necessary to determine in what order the liens shall be paid from the funds in the hands of the trustees. From what has been already said it follows that the devisees of Jemima Naudain have a prior and paramount claim to the proceeds arising from the sale of the tract of land called "Davis' Industry;" including the sum received from the wheat crop, adhering to the soil, and transferred to the purchaser of the realty. The judgment obtained, against D. C. Blackiston, by the Visitors and

Governors of Washington College, on the 11th day of May, 1868, had been on record during a period exceeding twelve years, when the deed of trust was executed on the eighteenth day of February, eighteen hundred and eighty-one. The indebtedness, represented by this judgment, not having been secured by the mortgage executed on the tenth day of February, eighteen hundred and seventy-seven, and the judgment not having been kept alive in the mode already designated, the bar of the Statute has been interposed, and the claim thus extinguished. It cannot therefore be admitted in the computation to be made by the auditor in the adjustment of his account.

It has been strenuously and ably contended in argument that the other judgments were merged in the mortgage subsequently executed; the mortgage being a specific lien on the land therein described, and absorbing and extinguishing the general liens, for the same indebtedness, acquired by the judgments antecedently obtained. The doctrine of merger, as it is technically understood, seems to have been derived from the principles applicable to feudal tenures, and to have relation only to estates in land. When a termor acquired the estate in reversion or remainder, the estate for life, or for years, was merged in the fee, the greater absorbing the less. This extinguishment of the term is founded on the maxim, *Nemo potest esse dominus et tennens.*

*Preston*, in his treatise on "*The Quantity and Quality of Estates*," says that "merger is described to be whenever a greater estate and a less coincide and meet in one and the same person, without any intermediate estate, whereby the less is immediately annihilated, or is said to be merged, that is, sunk or drowned in the greater. Nothing is more clear than that merger is an act of law; and it appears to be entitled to the denomination of the extinguishment, by act of law, of one estate in another by the union of these two estates. To consolidate two estates, and confound

them in one estate is its effect. The estate, thus blended, will give the precise time of enjoyment, originally limited by the more remote of the two estates and no more. This point should be kept steadily in view. It is always to be remembered that the estate, in which the merger takes place, is not enlarged by the accession of the preceding estate. After the merger, the only subsisting estate continues precisely of the same quantity and extent of ownership as it was before the accession of the estate which is merged." *Preston on Estates,* 7.

But in equity, merger is always a question of intent to be gathered from the nature and circumstances of the case. *Dirks vs. Logsdon,* 59 *Md.,* 173.

If it is sought to apply the doctrine of merger in this case it is difficult to perceive how a judgment, which is not only a lien on all the lands of the debtor, but under which an execution could be levied on his goods and chattels and credits, can, by mere operation of law, be merged in and extinguished by a mortgage which merely creates a specific lien, on the particular tract of land included within the scope of its description. The production of such an effect would seem to present the phenomenal indication of the greater interest being absorbed and annihilated by the less.

The doctrine of merger cannot be applied to mere evidence ; for it is important to distinguish between the debt itself and the proof of its existence. A debt is an obligation to pay a certain sum of money due from a debtor to his creditor. The obligation is imposed by the law of the land. That such an obligation exists is dependent upon the adduction of proof. The evidence may be multiform ; but when a judicial investigation has resulted in the rendition of a judgment, the original claim is said to be merged in the judgment. In other words, the specific cause of action has ceased to exist, and cannot subsequently become the foundation for another suit. The judgment has then

become the evidence of indebtedness, and has its incidents and advantages. But it does not follow that the debtor may not, in consideration for lenity and indulgence accorded him by his creditor, furnish the latter with additional evidence of the indebtedness. This is what is denominated collateral security. It is evident that this superadded security may assume the shape of a mortgage on the land of the debtor in which his wife's potential right of dower is pledged for the payment of the debt, and the creditor may thus be put in a far more eligible position than that which he had occupied antecedently to the creation of the additional lien.

The testimony in the cause apparently demonstrates that this was the impelling motive which urged the parties to the execution of the mortgage.

It has been contended that money was obtained by the mortgage, and that the sums thus loaned were applied to the payment of the claims created by the judgments which had been obtained in suits against the mortgagor. The evidence in the cause proves that this theory rests on no solid foundation. The mortgagor admits, in his testimony, that he never received any money; and, by the uncontradicted and corroborated testimony of Mr. Bannon, it is shown that the mortgagees applied the money to the purchase of the judgments, and having thus obtained assignments, held the mortgage as collateral security. This fact is established by the proof in the cause; and even in the absence of proof, on no other hypothesis could the assignments be accounted for in view of the debtor's recognized and ascertained situation of onerous pecuniary embarrassment.

The judgment of the Mutual Fire Insurance Co. of Kent County has not been barred by limitation, as there was a stay of execution for one year from the time it was rendered. It will therefore stand on a footing with the other judgments not affected by the Statute ; and come in gov-

erned simply by the rule applicable to the order of priority. As the lien created by the judgment of Harriet Tilghman, use of Westcott, use of Pumphrey, has been extinguished by lapse of time, and the failure to keep it alive, the mortgage must be received as evidence of indebtedness to the amount of the sum that was due on said judgment; and as the mortgage is the only existing evidence of this indebtedness its date must determine the order of priority in which this claim is to be allowed.

That a mortgage is not only a specific lien, but may be received as evidence of an indebtedness generally, was long ago determined in England. In the case of *King vs. King,* 3 *P. W.,* 360, the Lord Chancellor said "that every mortgage implies a loan, and every loan implies a debt; and that though there were no covenant or bond, yet the personal estate of the borrower of course remains liable to pay off the mortgage." The same principle had antecedently been recognized in other cases. 2 *Salk.,* 449; 1 *P. W.,* 294; 2 *P. W.,* 455.

As has already been said with respect to the lien of the judgment lost by lapse of time, the mortgage, held as collateral security, being now the only evidence of the indebtedness, the order of priority in which that indebtedness is to be paid must be determined by the date of the mortgage. The mortgage is not, however, the only evidence of the other liens, including the judgment of the Mutual Fire Insurance Co., which have not been barred by the operation of the Statute of Limitation; and as parties cannot, on any recognized principle, be precluded from offering the best evidence of the existence of their claims, those liens must be allowed in conformity with the rule by which the older stand first in the order of preference, which is to be determined by reference to their respective dates.

The cause will be remanded, so that, under the direction of the Circuit Court, the auditor may state an account in correspondence with the principles indicated in this

opinion. In the appeal of *Hannah M. Blackiston and others vs. Hurlock and Griffith,* the appellants had ample ground on which to invoke an exercise of the revisory powers of this Court. In that case it is therefore adjudged that the appellees pay the costs of the appeal. But as the Court was manifestly right in referring the cause back to the auditor, so that he might state an account in consonance with that portion of its instructions in which no error has been discovered, in the other appeals from the order and instructions of the Court below, it is adjudged that the appellants pay the costs.

> *Order affirmed in part, and reversed in part ; and cause remanded.*

(Decided 21st December, 1883.)


ALVEY, J., filed the following concurring opinion:

I concur in the conclusions arrived at in the foregoing opinion, but not in all the reasoning employed by the learned Judge who delivers it; and Judges MILLER and IRVING concur with me in this view.