ISELI *v.* CLAPP, ATTORNEY NAMED IN MORTGAGE

[No. 370, September Term, 1968.]

*Decided July 10, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SMITH, JJ.

*George H. Eggers* for appellant.

*Fenton L. Martin,* with whom were *Roger A. Clapp* and *Clapp, Somerville, Black & Honemann* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Appellant (Mrs. Iseli) insists it was error for the chancellor, Shearin, J., to overrule her objections to the ratification of the mortgage foreclosure sale of her house in Silver Spring. In January 1965, Max and Gertrude Iseli owned 1507 Oakview Drive. It had been their home for a number of years and it was encumbered by a $10,000 mortgage requiring monthly payments of $124. Because of Mr. Iseli's poor health they were unable to keep up the payments; as a result foreclosure proceedings were commenced in February. Some days before the scheduled sale they received the following letter:

"Foreclosure: February 10, 1965
Premises: 1507 Oakview Avenue, Silver Spring, Md.
Mr. Max R. Iseli:
Dear Mr. Iseli:
We discovered through the local papers that you are having trouble with your home financing. Unless this is straightened out immediately, you will lose your home and the equity that you have in it.
We have helped others in similar situations and it may be possible for us to help you save your home and credit and avoid the embarrassment of a foreclosure.

Please call Mr. Anderson or Mr. Walker at Juniper 8-9500 for further information.

Sincerely,
/s/ W. C. WALKER
Mr. Walker
[M & A Associates, Inc.]"

They "understood" that M & A Associates, Inc. (M & A) would take over the mortgage payments and that they, in turn, would pay M & A. They believed the paper they signed was a mortgage to M & A. Actually it was a deed. M & A thereupon leased the property back to them for a rental of $149, an increase of $25 over their previous monthly payments. In April M & A borrowed $12,500 from Laurel Building Association of Prince George's County (Laurel) to be repaid in monthly installments of $90. The president and secretary of M & A (apparently man and wife) also executed the mortgage in their individual capacities. At settlement $10,528.67 was withheld to satisfy the Iselis' existing mortgage. After deducting costs and expenses the balance paid to M & A was $1,197.66.

Soon thereafter, because of Mr. Iseli's rapidly failing health, they moved next door to the home of their daughter and their own property was rented. After her husband's death in September, Mrs. Iseli continued to receive $135 per month from her tenant. Some time thereafter, thinking she still owned the property, she put on a new roof and made minor repairs.

For reasons not disclosed in the record M & A, in June 1967, sought, unsuccessfully, to evict Mrs. Iseli. Thereupon, Mrs. Iseli filed a bill of complaint in the Circuit Court for Montgomery County (Equity No. 33385) seeking the rescission of the deed to M & A on the ground that its execution had been induced by fraud.

On 26 March 1968 Laurel began foreclosure proceedings against M & A (Equity No. 34766). On 22 April Mr. Clapp (the appellee) reported that, on 30 March 1968, he had sold the property to Louis Kriegsfeld for $14,700, he

being at that price "the highest bidder therefor" and that "said sale was fairly made." On the same day, 22 April, Mrs. Iseli filed objections to the ratification of the sale; she asked also that the foreclosure proceedings be stayed "pending the determination in Equity No. 33385." Both Kriegsfeld and the appellee, late in April, answered Mrs. Iseli's objections. Following a hearing on 24 May 1968, in Equity No. 33385, the court granted Mrs. Iseli's motion for summary judgment which, in effect, rescinded the deed and "declared [it] to be a mortgage." On 19 June 1968 she filed "supplementary objections" to the ratification of the sale claiming "Laurel did not have title or right to bring foreclosure" proceedings because (a) M & A "did not have the legal capacity to execute a mortgage" since it held the property "as constructive trustee" for her, and (b) "Laurel had notice of the infirmity in" M & A's title and was not therefore a bona fide purchaser. Laurel, she went on to allege, knew or should have known that the property was in the possession of a person other than the grantor and that the deed to M & A shows "it was given for a grossly inadequate consideration." She argues that because only $1.10 worth of Maryland Documentary Stamps were affixed to the deed this was notice to Laurel that M & A had paid only $1,000 for property which was being offered as security for a $12,500 loan. Actually $1.10 in stamps would be the tax for a consideration of $500. Code, Art. 81, § 277 (1965 Repl. Vol.). Although Mrs. Iseli made no mention of it the deed also bore $0.55 worth of Federal Documentary Stamps.

On 22 November 1968 Judge Shearin overruled Mrs. Iseli's objections to the sale. The order was filed on 25 November. Filed also was his opinion, excerpts from which follow:

"We do not agree with petitioner's contention that the deed, on its face, disclosed that the consideration apparently passing to the Iselis was 'grossly inadequate.' Since title was admittedly taken by M & A subject to a prior encumbrance

of $10,000.00, the apparent total consideration for the conveyance was $11,000.00. That Laurel was willing to lend $12,500.00 on the security of such a property does not, of itself, constitute a showing of bad faith. We have before us no evidence of fair market value at the time Laurel made its loan, nor is it disputed that $10,000.00, or more, of the proceeds of the loan was used to pay off the prior encumbrance. It is common knowledge that numerous economic factors can, and do, cause fluctuations in the market price of real estate; and, even in a generally stable market, speculators may, and do, take advantage of the financial distress of individual owners to their profit. On evidence before us, it would appear that any prudent and knowledgeable lender would have concluded that M & A had made a 'good buy' of the property in question but, without more, Laurel cannot be charged with notice that a fraud had been perpetrated."

\* \* \*

"The petitioner, as a result of our holding in Equity 33385, may be able to obtain some redress against the perpetrator of the fraud upon her (and her late husband). She will also be entitled to any surplus derived from the foreclosure sale involved herein.

"While neither of these avenues may lead to complete relief, we must, nevertheless, for the reasons set forth above, ratify the sale objected to herein."

### I.

No useful purpose will be served by an extended discussion of Mrs. Iseli's argument that the possession of the property by a person other than the grantor was notice to Laurel of an "infirmity" in M & A's title. In *Crossley v. Hartman,* 248 Md. 196 (1967), Judge Singley, for the Court, made a careful and thorough analysis of the

relevant decisions of this Court. We think *Crossley* is dispositive of all aspects of the issue presented by Mrs. Iseli's argument. As Judge Singley put it:

> "In the instant case, we think that the Chancellor below was in error in holding that the unexplained possession of a portion of the mortgaged premises by Mrs. Hartman and her nephew constituted constructive notice to a prospective mortgagee of the existence of an interest adverse to the record title. This is not the rule to be derived from the Maryland cases summarized above, nor is it in accord with the view taken by a majority of jurisdictions. See Annot., 105 A.L.R. 845, 849, and cases there cited; Casner, *American Law of Property* § 17.14 (1952); *Schell v. Kneedler*, 359 Pa. 424, 59 A. 2d 91, 2 A.L.R.2d 854 (1948) (Occupancy by record owner and another is not notice of latter's interest)."
>
> * * *
>
> "Although we recognize that circumstances might be presented which would put a prospective purchaser or mortgagee under a duty to inquire * * * continued possession by a prior owner is not so inconsistent with the record title as to amount to constructive notice, even although the original conveyance was procured by fraud. * * *." *Id.* at 209-10.

II.

The argument that the $1.10 Maryland Documentary Stamp on the deed was the equivalent of notice to Laurel that M & A had obtained the property "for a grossly inadequate consideration" strikes us as a somewhat awkward attempt at sophistry. We shall pass over the absence of any evidence that Laurel ever knew about the stamps. Even if Laurel had been aware of the stamps,

just what such knowledge ought to have suggested to any person knowledgeable and experienced in these matters is far from certain. The Federal stamps, in the amount of $0.55, would have suggested a consideration of $500, *exclusive of a subsisting lien,* 26 U.S.C. § 4361 (1964). A $1.10 State stamp, in 1965, might have suggested a consideration of $500 *inclusive of subsisting liens,* or it might have suggested that the clerk accepting the deed for record, or the person recording it, or both, were mistaken as to the applicable law. Code, Art. 81, § 277 (m) (1965 Repl. Vol.) ; 22 Op. Att'y Gen. 799 (1937). Of course, it might have suggested also an intention on the part of M & A to euchre the State out of $23.10 ($24.20—$1.10). But what it might have suggested, or ought to have suggested, or did suggest ceased to have any significance when Laurel and M & A closed the mortgage loan transaction. It was then clear that the Iseli property was encumbered by a mortgage and that $10,528.67 would have to be disbursed to satisfy it. Add to that the consideration that Mrs. Iseli argues is indicated by the stamps and the total consideration would seem to have been about $11,500. Mrs. Iseli, in furtherance of her theory of "grossly inadequate consideration," argues that a $12,500 loan, per se, indicates a real value of about $15,600, but there is no evidence, opinion or otherwise, that the property, in April 1965, had such a value. Moreover, it will be recalled, Laurel insisted that Anderson and his wife personally guarantee the mortgage debt so it is at least likely their financial condition, at the time, was such that Laurel felt adequately secured in the circumstances.

No one seems to doubt that M & A fraudulently induced Mrs. Iseli and her late husband to sign the deed to their property. Yet, when all things are considered, it must be admitted that she has not fared too badly. When M & A appeared on the scene the mortgage was about to be forclosed. That catastrophe was averted without cost to them. The rent from the tenant was nearly enough

to pay M & A its $149 per month which, of course, she ceased paying in June 1967. The $10,000 mortgage has been satisfied. She has paid nothing on Laurel's mortgage. If our calculation is correct she has collected about $3,000 in rent since June 1967. The deed to M & A has been set aside and the lease has been rescinded. There will be available to her out of the proceeds of the foreclosure sale in the case at bar perhaps as much as $1,000.

Mrs. Iseli, in support of her contention, cites a number of cases, mostly from other jurisdictions. *See* Annot., 42 A.L.R.2d 1088 (1955). We shall not undertake a discussion of them because, without exception, they deal with situations where the consideration for the deed or mortgage unquestionably was "grossly inadequate." That is not the situation in the case at bar. As Judge Shearin has said, "the apparent total consideration for the conveyance was $11,000." We are fully persuaded that it was not "grossly inadequate." That the property brought $14,700 at the foreclosure sale in March 1968, three years later, is pointed to as having significance but, if it has any, we do not find it persuasive. We think it fair to say, having in mind the number of appeals that have been argued in this Court in recent years, that there has been a notable increase in the value of Montgomery County real estate; indeed, it could be demonstrated, we suspect, that the Iseli property has not kept pace with the trend.

In conclusion we think what we said in *Wicklein v. Kidd,* 149 Md. 412, 424-25 (1926) is singularly apposite here:

> "[S]he placed properly executed deeds for certain of her properties in the possession of persons who later borrowed on these properties substantial sums of money from apparently innocent third parties. The questions we are concerned with are the rights of these third parties, not the rights of the appellant against the person who induced her to execute these deeds, and as between the appellant and these third

parties, the familiar principle that 'when one of two persons must suffer loss by action of a third person, the loss should fall on him who has enabled the third person to occasion such loss' must apply. In this case the action of the appellant in executing and delivering the deeds enabled Weissenborn to mortgage the properties to the appellees, and, as we think these last named are *bona fide* holders for value, their claims must prevail as against those of the appellant.

"We are not unmindful of the unfortunate situation of the appellant. Advanced in years and feeble in health, she now finds herself practically stripped of her property, but, under the testimony in this case, that property has been taken from her in such a way that her rights and equities are inferior to those of the appellees, who, without notice of any fraud or other unfair dealing, advanced money to those whom the appellant had clothed with the *indicia* of title. Under such circumstances, whatever redress the appellant has, is not against the appellees, but is against the man whose persuasiveness or deceit induced her to entrust him with properly executed deeds for her property."

*Order affirmed.*
*Costs to be paid by the appellant.*