952 A.2d 240

**Patrick T. HAND, Successor Guardian of the Property of Clifton D. Smith**

v.

**MANUFACTURERS & TRADERS TRUST CO., et al.**

**No. 109 Sept. Term, 2007.**

Court of Appeals of Maryland.

July 24, 2008.

376

George E. Meng (Meng & Alpert, LLC, Upper Marlboro), on brief, for Petitioner.

Matthew J. MacLean (Anne E. Langford of Pillsbury, Winthrop, Shaw, Pittman, LLP, Washington, DC), on brief, for Respondents.

ARGUED BEFORE BELL, C.J., *RAKER, HARRELL, BATTAGLIA, GREENE, MURPHY, and DALE R. CATHELL, (retired, specially assigned), JJ.

DALE R. CATHELL, Judge (retired, specially assigned).

Patrick T. Hand, Successor Guardian of the Property of Clifton D. Smith, petitioner, presents two questions as follows:[1]

I. WHERE CLAIM IS AGAINST A GUARDIAN, DOES THE DEFENSE OF LACK OF LEGAL CAPACITY TO THE CLAIM OF A HOLDER IN DUE COURSE, AS SET OUT IN COMMERCIAL LAW ARTICLE, § 3–305(a)(1)(ii), RELATE ONLY TO AN INDIVIDUAL'S MENTAL STATE?

II. DOES THE DEFENSE OF ILLEGALITY TO THE CLAIM OF A HOLDER IN DUE COURSE AS SET OUT IN COMMERCIAL LAW ARTICLE, § 3–305(a)(1)(ii), RELATE ONLY TO SITUATIONS WHERE THERE IS A DIRECT STATUTORY EXPRESSION THAT AN INSTRUMENT, ITSELF, ARISING FROM A PARTICULAR CONTRACT OR TRANSACTION IS VOID?

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

1. The questions, as re-phrased and presented by the respondent in its brief are as follows:

"1. Is a guardian's lack of authority to sign a negotiable instrument synonymous with 'lack of legal capacity' under Md.Code Ann., Com. Law § 3–305(a)(1)(ii)?

"2. Does a guardian's lack of authority to sign a negotiable instrument create an 'illegality of the transaction' under Md.Code Ann., Com. Law § 3–305(a)(1)(ii) which, under other law, nullifies the obligation of the Guardianship?"

Our resolution of the issues in this case negates any differences in the questions as presented by the parties.

In the circumstances of this case we answer no to the first question and yes to the second question, and shall affirm the judgment of the Court of Special Appeals.[2]

---

2. The petitioner, as indicated elsewhere, never raised at the trial level the issues it now raises. At that level it relied only on its position that Cordelia Smith was not authorized to sign the note. Petitioner presented a different, i.e., more general, question (from both the defense raised at the trial level and the questions raised on certiorari to this Court) at the Court of Special Appeals level. At the intermediate appellate court it asked only "Did the Court err in determining that M & T [Manufacturers & Traders Trust Co.] was not subject to the defenses raised by the guardian?" The only issue at the trial level was the question of an unauthorized signature under District of Columbia law.

We note that while the guardians have changed, the party, i.e., the estate of the ward had not changed at the times at issue here. The estate of the ward, through its designated and court approved guardian, was the party that affixed the signature to the documents and, as such, a party might have been subject to the provisions of the Uniform Commercial Code ("UCC") that provide that if the maker of a note, through negligence or intent, creates the situation where an unauthorized signature can be affixed, he is estopped from relying on that fact as a defense to the payment of negotiable instruments held by a holder in due course. We noted in the "check" case of *Dominion Construction, Inc. v. First National Bank of Maryland,* 271 Md. 154, 315 A.2d 69 (1974), that

"[The District Court judge] held that Dominion had been guilty of negligence which 'contributed substantially' to the making of an unauthorized signature by Gabriszeski an d the resulting payment of the proceeds to him.

. . .

"The finding of negligence, therefore, was amply supported by the totality of the evidence. As such, it was in accord with the statement in Official Comment 7 that the determination of negligence *vel non* should turn 'on the facts of the particular case.' We cannot say that the judgment . . . was clearly erroneous."

*Dominion Construction,* 271 Md. at 158–61, 315 A.2d at 71–73. *See also, New England Mutual Life Ins. Co. v. LaSalle Nat. Bank,* 697 F.Supp. 962 (N.D. Ill 1986), where the court stated:

"'Any person who by his negligence substantially contributes to a material alteration of the instrument, or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a hold [or] in due course. . . .'

Ill.Rev.Stat. ch.26, § 3–406. This section establishes that the maker of a note or drawer of a check owes a duty of care to the holder and the drawee. UCC Comments 1 & 2. Section 3–406 . . . . estops him [the maker] from asserting [the alteration] against the holder in due course or drawee. UCC Comment 5." (Some alteration in original.) *New England Mutual,* 697 F.Supp. at 965 (quoting Ill.Rev.Stat. ch. 26, § 3–406.). While it is clear that the same section of the UCC adopted

## Relevant Facts

We note that, although at one point a deed of trust (encumbering Maryland real property) was relevant and was involved in this particular issue, in the present nature of the case we are concerned primarily with a promissory note and the obligations of a holder in due course of such a note and the defenses, if any, that a maker of a promissory note may have vis à vis such a holder in due course.[3] All parties agree that the respondent in this case, Manufacturers & Traders Trust Co., et al. ("M & T"), is a holder in due course of the promissory note here at issue.

Ms. Cordelia Smith was appointed as the guardian of the property of her child, Clifton Smith, by the court in the District of Columbia where they were then residing.[4] They thereafter moved to Maryland where the proceeds of a settlement in respect to Clifton's injuries were used to buy them a home.

---

in Maryland applies to forged signatures and unauthorized alterations, it is not altogether clear that the same negligence standards would apply to unauthorized signatures in Maryland. In any event, it may well be that the possible presence of negligence problems on the part of the petitioner, have caused it to change its position between the trial court and the Court of Special Appeals and between that Court and this Court.

3. The promissory note at issue was at one point secured by a deed of trust on real property situate in Maryland, and the assignee of that deed of trust (also the holder in due course of the note) in this case, was seeking permission of the Circuit Court for Prince George's County (where the property was situate) to foreclose on that property. After the judgment was rendered below, that real property was sold by petitioner pursuant to a court authorization and the judgment in this case (or part of it) was paid (according to petitioner "it was a payment that was coerced") in order to get the respondent's consent so that the property could be sold. The validity of that sale is no longer at issue.

4. Clifton Smith had been the alleged victim of medical malpractice that left him in a retarded state and suffering from cerebral palsy and other medical problems. His claims arising out of that alleged malpractice were settled and that settlement included a provision for the purchase of a home for Clifton Smith in Clinton, Maryland. Thereafter, he and his mother, who was also his designated guardian, became domiciled in Maryland.

Thereafter, Cordelia Smith, while a resident of Maryland, contacted a mortgage broker for the purpose of securing financing to pay her bills, using the property of the estate in Maryland, which was titled as "Cordelia Smith, Guardian of Clifton Dominick Smith, a Minor Child," as collateral security for the repayment of the loan. She obtained a loan at this first financing of $69,000, and executed a bill obligatory (promissory note) and a Deed of Trust as Guardian. She then almost immediately obtained refinancing in the amount of $93,500 through the same process, i.e., the execution of a bill obligatory collaterally secured by a deed of trust and the guardianship property. The proceeds from this refinancing were used, for the most part, to pay off the first indebtedness. The first financing transaction is not before this Court. It is only the refinancing that is presently at issue.

All of the instruments for the financing and refinancing were signed by Cordelia Smith in her capacity as Guardian of the Property of Clifton Dominick Smith, a Minor Child. Cordelia Smith, as Guardian, neglected to obtain permission from the court in the District of Columbia in respect to the execution of the deed of trust. The law in the District of Columbia required that she get approval from that jurisdiction's court for such transactions involving the real property of her ward. Petitioner (the successor guardian), in his brief, relies on D.C.Code § 21–157 (2001),[5] the relevant parts of which are reiterated in petitioner's brief, as follows:

"Where it appears to the court by proof that it would be for the advantage of the infant to raise money by mortgage ... the court may, on the application of the guardian ... decree[6] a conveyance of the property, by mortgage or deed of trust...."

---

5. He had filed a Notice of Intent to Rely Upon Foreign Law, identifying that section of the District of Columbia Code. The date of the refinancing at issue in the case at bar was July 10, 1997, the applicable section of the code, as quoted by petitioner, has not changed since 1997. D.C.Code § 21–157 (1981, 1997 Repl.Vol.).

6. It is not altogether clear how a court in a foreign jurisdiction "decrees" the sale of property in Maryland or enforces its decree in

The property at issue, however, is situate in Maryland, where such approvals, generally, are not required under the Maryland statutes, *infra.*

The bill obligatory and deed of trust involved here were assigned by the original creditor to Contimortgage Corporation and M & T subsequently succeeded to Contimortgage's interest. As previously stated, it is conceded by all parties that M & T is a holder in due course of the bill obligatory at issue in the case at bar.

In the meantime, Cordelia Smith, upon her own petition, was removed as Clifton's guardian by the District of Columbia court and Patrick T. Hand was appointed Clifton's Successor Guardian by the same court.[7] No guardianship proceeding then existed in the State of Maryland, albeit the property at issue was in this State. Upon Clifton's reaching the age of 18 when he was no longer a minor, a new guardianship proceeding was then initiated in the State of Maryland where he was then (and had been) a resident, and Patrick Hand was appointed by the Maryland court as the Guardian of the property of Clifton Smith under that new guardianship.

Ultimately, the note at issue came in arrears and litigation was instituted in Maryland by M & T against Hand, Cordelia Smith and Clifton Smith, for the default in payment and a Declaratory Judgment count was included seeking a court order that M & T had the right to foreclose on the Deed of Trust and an order was sought authorizing M & T to, in fact, initiate foreclosure proceedings.

-----

Maryland, absent a Maryland court proceeding. Nor is it clear how a subsequent title examiner examining the land records of the Maryland county where the property is situate is to know of the existence of or to examine "decrees" of the Courts in the District of Columbia, or in Oregon, or in Hawaii, or in Alaska or any other state as the case may be.

7. While the Guardian was replaced, no new guardianship proceeding was initiated at that time, and the guardianship action remained the same.

A default judgment was entered against Cordelia Smith. A trial was held. The Guardianship defended on the grounds that Ms. Smith had no authority to borrow money on behalf of the guardianship and to encumber guardianship property because of her failure to obtain the approval of the District of Columbia court before encumbering the property, even though the real property was situate in Maryland.[8] The trial court did not rule on whether M & T had the authority to institute foreclosure proceedings under the Deed of Trust.[9]

M & T took, and takes, the position that because it is a holder in due course it would take the bill obligatory free and clear of the asserted defenses (including the proffered defense that Cordelia Smith had not obtained permission from the court in the District of Columbia to execute the documents) in that M & T had no actual notice of the defect (if it is a defect). M & T prevailed at the trial level on the main issue but was not awarded the attorney's fees it had sought under the provisions of the note.[10] Both parties appealed to the Court of Special Appeals—the Guardianship alleging for the first time that Cordelia Smith lacked legal capacity to sign the note and that the transaction was illegal for failure of court approval by the court of the District of Columbia. M & T appealed the failure of the trial court to award it legal fees.

---

**8.** Petitioner alleges that such court approval is required by the law of the District of Columbia although, according to petitioner, no comparable statute exists in Maryland.

**9.** As indicated elsewhere, the parties apparently entered into some type of agreement that permitted the Guardianship to sell the property pursuant to court permission, with M & T signing off on the sale upon receipt of a certain (unspecified in the record) sum of money. Petitioner alleges that the payoff to M & T was made under duress or coercion (even though the sale was made pursuant to a court order). The issue of the existence or non-existence of coercion or duress is not contested by the parties and thus is not directly before the Court in this case, albeit our decision on the questions presented resolves that issue as well.

**10.** M & T received a money judgment in its favor of $130,098.31 against the Guardianship and Ms. Smith in her individual capacity.

In affirming the trial court, Judge Barbera, for the Court of Special Appeals, correctly resolved the issues, saying, in relevant part, as follows:

"The [trial] court found that M & T Bank purchased the Note for value, in good faith, and without notice that it contained an unauthorized signature. That finding is supported by evidence offered by M & T Bank. The evidence showed that M & T Bank had purchased the Note and the Deed of Trust for value and conducted an appropriate due diligence investigation prior to the purchase. The investigation included a review of the title commitment, which reflected that the Property was vested in 'Cordelia A. Smith, Guardian of Clifton Dominick Smith, Minor Child.' M & T Bank's agents also reviewed the Deed of Trust.... Further, they confirmed that they had a copy of the order appointing Ms. Smith as Guardian....

We agree ... moreover, that there is no merit to appellant's claim that various loan documents should have raised questions.... None of these documents raises a concern about Ms. Smith's authority to sign as Guardian ...."

A Petition for Writ of Certiorari was filed by the Guardianship with this Court, which we granted at *Hand v. Manufacturer's Trust*, 402 Md. 355, 936 A.2d 852 (2007). No cross-petition was filed by M & T.

## Discussion

▬ Respondent asserts in its brief,[11] as follows:

"Throughout his brief, Mr. Hand refers to the Promissory Note as a 'Deed of Trust Promissory Note,' attempting to superimpose laws relating to real estate conveyances onto the Maryland Uniform Commercial Code, which does not involve real estate.... In fact, the deed of trust on the property and the Promissory Note are separate instruments. The deed of trust is no longer at issue in this case, as Mr. Hand has sold the property, and the deed of trust

---

11. There was no reply brief filed by petitioner.

has been released. At this stage, the case only involves the enforceability of the Promissory Note, and not the enforceability of the deed of trust."

We agree. Generally, bills obligatory which are secured by mortgages or deeds of trust are separate instruments and can be proceeded on separately. We noted in *Katz v. Simcha Co., Inc.*, 251 Md. 227, 246 A.2d 555 (1968), a case in which it was argued that there were irregularities in District of Columbia foreclosure sales in respect to deeds of trust securing the promissory notes at issue in the Maryland case, as follows:

"The appellants advanced the argument that the appellee sued in the wrong cause of action and could not sustain a suit for a deficiency because the deed of trust did not contain a covenant to pay the debt. This was an action brought to obtain a judgment for the unpaid balance . . . on the two promissory notes which were secured by two deeds of trust. . . . The action was not on the deeds of trust but rather on the obligation contained in the two notes which were secured by the deeds of trust. Appellants have not afforded us with any authority which would persuade us that the appellee, holder of the notes, could not properly proceed in a separate action on the notes to recover the deficiency remaining after the foreclosure proceedings. . . .

"However, there is nothing in this rule to prevent the mortgagee from proceeding by a separate action at law. With regard to the deed of trust, the holder of the note could only proceed to obtain a decree *in personam* for the deficiency in the foreclosure proceedings in the event there was a covenant to pay the obligation in the deed of trust. However, this would not preclude the holder of the note secured by the deed of trust from proceeding in a separate action at law to obtain judgment for the balance due and owing on the note, together with interest, after a proper credit had been given on the notes of the proceeds realized from the foreclosure proceedings. The important thing is, there can be only one satisfaction of the obligation. In the instant case we are of the opinion that the appellee had the right to bring this action at law for the balance due and

owing on the notes, together with interest, in the Circuit Court for Montgomery County." (Citation omitted.)

*Katz,* 251 Md. at 237–38, 246 A.2d at 561.

We had opined earlier in *American National Bank of Maryland v. Mackey,* 247 Md. 319, 231 A.2d 15 (1967), that:

" 'There is one provision in the mortgage itself for the payment of attorney's fees, and another and different provision on the same subject in the notes which were secured by the mortgage. * * * The two provisions are separate and distinct, without any reference in the one to the other. There is an independent field of operation for each of them. A creditor whose demand is evidenced by the debtor's personal obligation, which is secured by a mortgage upon land, has the choice of foreclosing the mortgage upon the breach of the condition thereof, or of proceeding against the debtor without regard to the mortgage security. If either of the two resources may be exhausted without satisfying the demand, resort may be had to the other. Until the demand is satisfied, the creditor may seek at the same time, but by separate and independent proceedings, both the enforcement of the personal liability of the debtor, and the foreclosure of the mortgage security.' "

*American National Bank,* 247 Md. at 324–25, 231 A.2d at 19 (quoting favorably from *Tompkins v. Drennan,* 95 Ala. 463, 10 So. 638 (1892)).

In *Frederick Town Sav. Inst. v. Michael,* 81 Md. 487, 32 A. 189 (1895), a case primarily involving the issue of a wife's dower rights and questions relating to the effect of insolvency on transfers, we noted as follows:

"But let us inquire as to the legal status of the note of Wilcoxon and wife, after the mortgage had been declared an illegal and fraudulent preference. It was not a necessary incident to the execution of a valid mortgage, that a note of any kind should have been given. The mortgage would have been equally valid without it, and if given, it was only collateral to the note, and the wife was in no sense a necessary party to the note. The almost universal practice

in this State has been for the wife to join with her husband in the execution of the mortgage, for the *sole* purpose of releasing and conveying her potential right of dower; but to the accomplishment of this purpose it was in no respect essential that she should join in the making of the note.

. . .

"We are, after careful consideration, unable to lend our sanction to the theory advanced, that in striking down the mortgage as a fraudulent preference under our insolvent laws, the note, which the mortgage was given to secure, must also abide the same result. We do not think, upon principle or authority, that any such conclusion follows from the premises stated." (Emphasis in original.)

*Frederick Town,* 81 Md. at 499–501, 32 A. at 190–91.

The relevant District of Columbia statute referenced by petitioner, apparently relates only to mortgages or other instruments of conveyance. It does not directly reference the necessity to obtain court approval for borrowing via bills obligatory—it only would require court permission to encumber the land as collateral security for the note. There may be some other District of Columbia statute that restricts the authority of a guardian to execute notes on behalf of the guardianship estate. In light of our decision—it is not necessary to further review the statutes of the District of Columbia.

Accordingly, we see no impediment for the action filed by respondents in the present case, to enforce the repayment of the promissory note at issue here. Although the property securing the promissory notes was sold by the Guardian pursuant to an order of the Maryland Court, in Maryland a promissory note obligation can be proceeded on even though the collateral security, i.e., mortgage or deed of trust has been, or is in the process of being, foreclosed upon, so long as the total recovery, i.e., what was paid to the creditor during the sale aforesaid and what is recovered under the action to enforce the promissory note, does not exceed the total sum due the creditor.

*Guardianship*

The order of the Superior Court of the District of Columbia–Probate Division, appointing Ms. Smith as guardian of Clifton Dominick Smith, provided in relevant part, as follows:

"ORDER APPOINTING GUARDIAN OF THE PROPERTY

"Upon consideration of the Petition for Appointment of Guardian of Property filed herein by Cordelia Smith on April 7, 1994, and it appearing to the satisfaction of the Court that said Petitioner is entitled to Guardianship of the property of Clifton Dominick Smith, Minor Child, born February 19, 1987, and said Cordelia Smith having personally appeared for an interview in the Office of the Register of Wills; it is by the Court this 14th day of April, 1994,

"ORDERED, that Cordelia Smith be and she is hereby appointed Guardian of the property of Clifton Dominick Smith, Minor Child, subject to the filing of an undertaking, with surety approved by the Court in the sum of $30,000.00, conditioned upon the faithful performance of her trust.

[Signature of Margaret A. Hayward] Judge"

As is clear, the order did not contain within it any expressed limitations on the powers of the Guardian, nor did it direct attention to the alleged District of Columbia statute that, according to petitioner, requires the prior approval of the court before a guardian can encumber the real property of a ward. Maryland Code (1974, 2001 Repl.Vol.), § 13–215 of the Estates and Trusts Article, provides that: "If the court limits any power conferred on the guardian by ... § 15–102 of this article, the limitation shall be endorsed upon his letters of appointment." Section 15–102, provides, in relevant part, as follows:

"§ 15–102. **Powers of fiduciary.**

(a) *Definitions* ....

. . .

(3)(i) 'Fiduciary' means ... a ... guardian of the property of a minor or a disabled person ....

. . .

(b) *In general.*—(1) A fiduciary may perform the functions and duties enumerated in this section without application to, approval of, or ratification by a court. . . .

(b) *Property.*—He may invest in, sell, mortgage, exchange, or lease any property, real or personal.

(d) *Borrow money.*—He may borrow money for the purpose of protecting property and pledge property as security for the loan. . . .

. . .

(x) *Exercise by guardian of inter vivos powers.*—A guardian may exercise any inter vivos power which the minor or disabled person could have exercised under an instrument, including the power to sell, mortgage, or lease."

Md.Code (1974, 2001 Repl.Vol., 2007 Supp.), § 15–102 of the Estates and Trusts Article.

Maryland Code (1974, 2001 Repl.Vol.), § 13–219 of the Estates and Trusts Article, provides, as follows:

**"Protection of person dealing with guardian.**

In the absence of actual knowledge or of reasonable cause to inquire whether the guardian is improperly exercising his power, a person dealing with the guardian need not inquire whether the guardian is exercising it properly, and is protected as if the guardian properly exercised the power, *except that every person is charged with the actual knowledge of any limitations endorsed on the letters of guardianship. A person need not see to the proper application of estate assets paid or delivered to a guardian."* (Emphasis added.)

As is apparent from the letters of guardianship (the order of the District of Columbia court), there were no limitations endorsed on the letters of guardianship.[12]

---

**12.** Moreover, the District of Columbia statute that is brought to our attention by quotation in petitioner's brief, to the extent to which it may be applicable in that jurisdiction, only addresses the power of a guardian to execute mortgages or deeds of trust. Therefore, even if applica-

Maryland Code (1974, 2001 Repl.Vol.), § 13–216 of the Estates and Trusts Article, provides, as follows:

"**§ 13–216. Liability for breach of fiduciary duties; rights of purchasers.**

(a) *Liability of guardian*—If the exercise of a power is improper, the guardian is liable for breach of his fiduciary duty to the minor or disabled person or to interested persons for resulting damage or loss to the same extent as a trustee of an express trust.

(b) *Rights of purchasers*—The rights of purchasers and others dealing with a guardian shall be determined as provided in § 13–219 and are not necessarily affected by the fact that the guardian breached his fiduciary duty in the transaction."

### *Holder in Due Course*

The underlying basis for the holder in due course doctrine is succinctly stated in a case from another jurisdiction involving checks. In *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209 (Colo.2008), the Supreme Court of Colorado sitting En Banc, stated:

"The holder in due course doctrine is designed to encourage the transfer and usage of checks and facilitate the flow of capital. An entity may qualify as a holder in due course even if the instrument at issue may have passed through the hands of a thief. ('The holder in due course is one of the few purchasers in Anglo–Saxon jurisprudence who may derive a good title from a chain of title that includes a thief in its links.')

"A holder in due course must meet five conditions: (1) be a holder; (2) of a negotiable instrument who took it; (3) for

---

ble, it would only apply to the execution of the deed of trust. In that event, even if it were to nullify that document, the results would be that the property would no longer be collateral securing the note. The ultimate effect would be that the obligation evidenced by the note would not be secured by the collateral—not that the note is void or voidable.

value; (4) in good faith; (5) without notice of certain problems with the instrument." (Citations omitted.) (Footnotes omitted.)

*Georg,* 178 P.3d at 1212–13. *See also Whittington v. Patriot Homes, Inc.,* Nos. 06–1068, 06–2129, U.S. Dist. Slip Copy, 2008 WL 1736820, at *6 (W.D.La. April 11, 2008), ("[I]f Vanderbilt achieves holder in due course status, it will be entitled to payment on the note.... It is undisputed that Vanderbilt took Finance Contract # 2 for value, and it is likewise undisputed that at the time it took the note, it had no notice of any default, unauthorized signature, alteration, claim, or defense that the Whittingtons might have in fact."); *In re Swanson,* No. 0708912, Bkrtcy. Slip Copy, 2008 WL 895666 (Bkrtcy. N.D.Ill. March 31, 2008), ("Holder in due course status gives the transferee the right to enforce a negotiable instrument subject to the following defenses: (i) infancy; (ii) duress, lack of legal capacity, or illegality; (iii) fraud; or (iv) discharge of the obligor in bankruptcy.").

Title 3, Subtitle 3, of the Maryland Code, Negotiable Instruments, Enforcement of Instruments, provides in relevant part, as follows:

" '[H]older in due course' means the holder of the instrument if:

(1) The instrument when issued *or negotiated* to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) The holder took the instrument (i) for value, (ii) in good faith ... (iv) without notice that the instrument contains an unauthorized signature ... (vi) without notice that any party has a defense ... described in § 3–305(a)." (Emphasis added.)

Md.Code (1975, 2002 Repl.Vol.), § 3–302 of the Commercial Law Article. Section 3–305(a)(1) provides in relevant part, as follows:

"**§ 3–305. Defenses and claims in recoupment.**

(a) ... [T]he right to enforce the obligation of a party to pay an instrument is subject to the following:

(1) A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings ...."

Md.Code (1975, 2002 Repl.Vol.), § 3–305 of the Commercial Law Article.

### Legal Capacity

■ We have not found a Maryland case on point, i.e., involving a guardian and ward in which the facts are sufficiently similar to those in the present case. The parties in their briefs have not directed us to any such cases.[13] But, properly stated, the legal capacity issue relates to whether any guardian has the legal capacity to act (as the guardian acted in this case) on behalf of a ward. Related to that issue, is the question of whether Ms. Smith was, in fact, the guardian of the ward in this case. There is no allegation that Ms. Smith's appointment as guardian was in any way defective. Accordingly, she was the proper guardian at all times relevant to this case.

There are several Maryland cases, however, in which the issue of "legal capacity" is explained, involving persons with different statuses than that of guardian, but whose legal capacity was challenged. Several of the early cases involve persons who were incompetent via lack of mental capacity, age

---

**13.** The parties disagree on the importance of *Katski v. Boehm*, 249 Md. 568, 241 A.2d 129 (1968). Because the facts of this case do not indicate any mental deficiencies, or the like, on the part of either the guardian or successor guardian, *Katski* offers little precedential assistance in the case *sub judice*. The incompetency of the ward is not an issue in this case. Nor is there any allegation that either of the guardians were, themselves, incompetent.

or other factors. Two of them illustrate examples of when there is a lack of legal capacity. In *Brawner v. Franklin,* 4 Gill 463 (1846), the Court opined, as follows:

> "It is a general and well settled principle, as well at law as in equity, that no person under the age of twenty-one years, is competent to make a contract, binding upon him, unless it be for 'necessaries.' Until his arrival at that age, the law presumes his incompetency to protect his interests, and manage his own concerns; and therefore casts around him its protection and *guardianship,* as to all his contracts.... The law imputes to an infant, an incapacity to assume responsibilities, or incur debts, unless it be for necessaries; and denies to him a legal capacity to borrow money, because he is incompetent to make of it, an advantageous or judicious application." (Emphasis added.)

*Brawner,* 4 Gill at 468–69.

In *Wilson v. Watts,* 9 Md. 356 (1856), it was being argued that although the debtor was not *non compos mentis,* the particular transaction was so unfavorable to him that he should be treated as having an "equitable incapacity" and that the transaction, for that reason should be voided. The Court disagreed, saying:

> "In what this imbecility consisted does not appear.... [T]hat some of the witnesses entertained no very high opinion of his *'financiering'* abilities, it is also clearly shown by the proof that he was not non compos mentis....
>
> '[W]here a weak man gives a bond, if there be no fraud nor breach of trust in its obtention, equity will not set aside the bond, for the weakness of the obligor alone, if he be *compos mentis.* Nor will a court of equity measure the size of men's understanding and capacity, there being no such thing as an equitable incapacity where there is legal capacity....'
>
> . . .
>
> " 'If, as has been observed, there is a general hardship affecting a general class of cases, it is a consideration for the Legislature, not for a court of justice. If there is a

particular hardship from the particular circumstances of the case, nothing can be more dangerous or mischievous than, upon those particular circumstances, to deviate from a general rule of law.' "

*Wilson,* 9 Md. at 457–58. *See, Wilson v. Farquharson,* 5 Md. 134, 139 (1853), "[T]here is 'no such thing as an equitable incapacity where there is a legal capacity.' "

One of the other earlier cases was the insolvency case of *United States v. Poe,* 120 Md. 89, 87 A. 933 (1913). The case involved a receiver who, like a guardian, has certain fiduciary responsibilities. There in explaining the need or application of "reserves," the Court said the following by way of example, as dicta in that case:

"The order now appealed from in terms proposes the like cancellation upon an absolute date named therein, of all existing obligations of the company. These obligations, from the nature and character of the business conducted by the corporation, are in some respects peculiar to corporations conducting a surety business. For purposes of illustration take a guardian's bond. The object and purpose of it is to protect the interest of a minor with respect to funds in the hands of the guardian; the ward is of course not of age and may not come of age, so as to be able to maintain an action for a default upon that bond for a number of years. A default may have actually occurred and yet the ward be in ignorance of the fact, not merely at the time of the actual default, but may have been on January 13th, 1913, and may continue to be so for still a considerable period of time. No authority has been cited nor is any believed to exist which will go the extent . . . of declaring that a Court of Equity has the power, in the exercise of an *equitable* jurisdiction, to declare such obligation to be . . . void because the ward who was designed to be protected, and who is without the legal capacity *to take any proceeding,* has not filed a claim. . . . Growing out of such conditions there has arisen a practice, . . . requiring the compa-

nies ... to maintain ... a reserve or premium reserve...."
(Last emphasis added.)

*Poe,* 120 Md. at 94–95, 87 A. at 934.

While certainly not on point with the present case, *Poe* illustrates that lack of legal capacity relates to the legal ability to maintain legal proceedings. It also, as incidental to the present case, points out that the ward's cause of action, upon reaching maturity or upon having a subsequent guardian appointed because of the malefaction of the prior guardian, is primarily against the prior guardian's bond.

One of the issues in *Iseli v. Clapp,* 254 Md. 664, 255 A.2d 315 (1969), related to the issue of a constructive trust. Ms. Iseli (Mr. Iseli was deceased at the time of the litigation) claimed that the property being sold at foreclosure had been fraudulently obtained by M & A Associates, Inc. (M & A), that had then mortgaged the property to Laurel Building Association of Prince George's County. Iseli objected to the ratification of a mortgage foreclosure sale based upon the alleged fraud by M & A. She attempted to argue that her continued residence in the subject property should have been notice of a lack of complete title in M & A. There we noted, as follows:

"On 19 June 1968 she filed 'supplementary objections' to the ratification of the sale claiming 'Laurel did not have title or right to bring foreclosure' proceedings because (a) M & A 'did not have the legal capacity to execute a mortgage' since it held the property 'as constructive trustee' for her, and (b) 'Laurel had notice of the infirmity in' M & A's title and was not therefore a bona fide purchaser. Laurel, she went on to allege, knew or should have known that the property was in possession of a person other than the grantor and that the deed to M & A shows 'it was given for a grossly inadequate consideration.' ...

"On 22 November 1968 Judge Shearin overruled Mrs. Iseli's objections to the sale.... Filed also was his opinion, excerpts from which follow:

. . .

'The petitioner, as a result of our holding in Equity 33385, may be able to obtain some redress against the perpetrator of the fraud upon her (and her late husband). She will also be entitled to any surplus derived from the foreclosure sale involved herein.

'While neither of these avenues may lead to complete relief, we must, nevertheless, for the reasons set forth above, ratify the sale objected to herein.'

. . .

"In conclusion we think what we said in *Wicklein v. Kidd,* 149 Md. 412, 424–[ ]25[, 131 A. 780, 785] (1926)[,] is singularly apposite here:

'[S]he placed properly executed deeds for certain of her properties in the possession of persons who later borrowed on these properties substantial sums of money from apparently innocent third parties. The questions we are concerned with are the rights of these third parties, not the rights of the appellant against the person who induced her to execute these deeds, and as between the appellant and these third parties, the familiar principle that, 'when one of two persons must suffer loss by action of a third person, the loss should fall on him who has enabled the third person to occasion such loss' must apply. In this case, the action of the appellant in executing and delivering the deeds enabled Weissenborn to mortgage the properties to the appellees, and, as we think these last named are *bona fide* holders for value, their claims must prevail as against those of the appellant.' "

*Iseli,* 254 Md. at 667–72, 255 A.2d at 317–19. In the present case not only was it the estate of the ward, through its guardian, that created the indebtedness and executed the bill obligatory (and the deed of trust), but it was the person of the guardian of the estate who misappropriated the assets derived from that transaction. Manufacturers & Traders Trust Co. was not a party to that prior transaction, but merely a later assignee of the indebtedness. It stands in similar shoes to

Laurel Building Association of Prince George's County in *Iseli*.

We also briefly discussed the doctrine of "legal capacity" in the later case of *Friendship Heights and the Hills v. Funger*, 265 Md. 339, 341, 289 A.2d 329, 330 (1972), a case challenging the legal capacity of a tax district to maintain judicial proceedings, i.e., to sue. There, we said "Each of the defendants ... [raised an] objection under [the rule] ... 'lack of legal capacity to sue....'" We shall affirm ... because the Committee lacked the capacity to bring the action." The Court of Special Appeals has also noted that there is a difference between *standing* and *lack of legal capacity* in *Kirgan v. Parks*, 60 Md.App. 1, 5, 478 A.2d 713, 715 (1984), "The appellees ... [alleged by motion] that as a testamentary beneficiary Mrs. Kirgan lacked legal capacity and standing to sue.... [We pointed] out that the challenge to Mrs. Kirgan's status related to her *standing* to maintain the action ... rather than to her *legal capacity* to sue...."

We have attempted to examine the cases of other states. There also, we find little on point. We will, therefore, discuss cases in which the fiduciary's character is somewhat different, but in which some of the relevant factors are the same. In *Ohlstein v. Hillcrest Paper Co.*, 24 Misc.2d 212, 195 N.Y.S.2d 920 (1959), the issue concerned whether a former stockholder had legal capacity to maintain suit. The court stated, as follows:

"Legal incapacity, as properly understood, generally envisages a defect in legal status, **not** lack of a cause of action in one who is *sui juris*. The distinction was succinctly and—in the light of social progress in the development of the law—quaintly touched upon by Judge HIRAM DENIO in *Bank of Havana v. Magee*, 20 N.Y. 355, 359[ (1859)]: 'The objection is not, I conceive, that the plaintiff has not a capacity to sue, but that no person, natural or artificial, is named as plaintiff. Certain persons, as infants, idiots, lunatics and married women, cannot sue except by guardians, next friends, committees, or in the case of married women, by joining their husbands in certain cases.'... 'There is a difference

between capacity to sue, which is the right to come into court, and a cause of action, which is the right to relief in court. Incapacity to sue exists when there is some legal disability, such as infancy or lunacy or *want of title in the plaintiff to the character in which he sues.* The plaintiff was duly appointed receiver and has a legal capacity to sue as such.... Incapacity to sue [and be sued] is not the same as insufficiency of facts to sue upon.' " (Citations omitted.) (Emphasis added.)

*Ohlstein,* 195 N.Y.S.2d at 922–23.

In the present case there is "no want of title to the character ..." of Patrick T. Hand, successor Guardian, nor was there any want of title to the character of Guardian when Cordelia Smith was the Guardian of the ward. None of the parties have challenged the appointment of Ms. Smith as Guardian by the appropriate courts of the District of Columbia. The argument is, that once properly appointed, she acted without certain required authorization, but there is no challenge to her status as Guardian during the relevant times. *See, Clark v. Bilt–Rite Land Corp.,* 82 Misc.2d 1026, 372 N.Y.S.2d 466, 467 (1975), ("[W]hether Clark [the minor who had come of age during the proceedings] or the named guardian ad litem is regarded as the party plaintiff, neither one lacks the legal capacity to bring an action."). In *Klak v. Skellion,* 317 Ill.App.3d 1092, 251 Ill.Dec. 694, 741 N.E.2d 288 (2000), a minor child had filed an action seeking to have her parentage determined. There the Illinois court opined:

"Initially, we note that a minor does not have the legal capacity to initiate, pursue or maintain legal action in her own name. A legal action may be maintained on behalf of a minor child by her parent or legal guardian....

. . .

"Instead, a minor child must appear by a guardian, guardian *ad litem,* parent, next friend or custodian." (Citations omitted.)

*Klak,* 317 Ill.App.3d at 1094–96, 741 N.E.2d at 290–91. In *D'Onofrio v. D'Onofrio,* 344 N.J.Super. 147, 155, 780 A.2d 593,

597 (2001), the New Jersey Court stated: "Because children lack the legal capacity to consent, courts have held that a parent or guardian may authorize the recording of his or her minor child's conversations."

The New York intermediate appellate court in *Security Pacific Nat. Bank v. Evans*, 31 A.D.3d 278, 820 N.Y.S.2d 2 (2006), was presented with the issue of the difference between standing and legal capacity (in a case involving the existence of a corporation). It stated:

"The doctrine of standing is an element of the larger question of justiciability and is designed to ensure that a party seeking relief has a sufficiently cognizable stake in the outcome so as to present a court with a dispute that is capable of judicial resolution. The most critical requirement of standing . . . is the presence of 'injury in fact-an actual legal stake in the matter being adjudicated.'

"The similar but not identical doctrine of legal capacity, by contrast, concerns a litigant's power to appear and bring its grievance before the court. Legal capacity to sue, or lack thereof, often depends purely on the litigant's status, such as that of an infant, and adjudicated incompetent, a trustee . . . ." (Citations omitted.)

*Security Pacific*, 820 N.Y.S.2d at 3–4.

Accordingly, we hold that a guardian of a ward, generally, has legal capacity to maintain an action, and moreover, based upon the statutes we reference *infra* and *supra*, duly appointed guardians in this State specifically have the legal capacity to do what was done here. Moreover, we hold that Corelia Smith was the duly constituted proper guardian to conduct the transactions occurring here, neither was she in any way incompetent or incapacitated at the time, albeit she may have been a wrongdoer.

As is clear from the Maryland statutory provisions above cited, a guardian, such as in the case at bar, has the capacity, in Maryland and in the District of Columbia (albeit in the case of loans collaterally secured by the property of the guardianship estate they are required to seek court approval in the

District of Columbia in order to encumber the property), to enter into transactions, such as the one at issue. It cannot be reasonably argued that there is any lack of legal capacity, generally, for guardians to enter into such transactions (whether specifically authorized or not). Legal capacity and legal authorization are different concepts entirely. Creating legal capacity is, in fact, one of the primary reasons for the appointment of guardians in the first instance. Nor is there any allegation that Ms. Smith suffered, herself, from any mental infirmity. Ms. Smith knew exactly what she was doing when she did it. She had legal capacity.

### Defense of Illegality

■ There is also a paucity of Maryland case law in respect to the defense of illegality in a holder in due course context. A comparatively recent treatment of the general issue is our case of *Weast v. Arnold,* 299 Md. 540, 474 A.2d 904 (1984). There we were primarily concerned with the "shelter" provision of then Md.Code (1975, 1997 Repl.Vol.) § 3–201 of the Commercial Law Article (now found, as amended, in § 3–203).[14] In that case, Judge Rodowsky, for the Court, noted as follows:

> "However Ruth's argument that she achieved holder in due course status rests on the 'shelter' provision of [Md.Code] § 3–201[, *supra*]. That section reads in relevant part:
>
> '(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or

---

14. § 3–203 in relevant part, now provides:

"(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument." Md.Code (1975, 2002 Repl.Vol.), § 3–203 of the Commercial Law Article.

In the case at bar there absolutely is no assertion that the respondent "engaged in fraud or illegality" affecting the instrument.

illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

(2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred.'

Ruth is not a prior holder of the Arnold notes. Nor has it been suggested that she was a party to any fraud or illegality affecting those instruments. Thus, under § 3–201(1) SNB, as a holder in due course, transferred its rights as such a holder to Ruth. This result is explained in Official Comment 3 to § 3–201:

'A holder in due course may transfer his rights as such. The 'shelter' provision of the last sentence of the original Section 58 is merely one illustration of the rule that anyone may transfer what he has. Its policy is to assure the holder in due course a free market for the paper, and that policy is continued in this section.'

The comment is followed by illustrations of which example (a) is particularly pertinent here.

'A induces M by fraud to make an instrument payable to A, A negotiates it to B, who takes as a holder in due course. After the instrument is overdue B gives it to C, who has notice of the fraud. C succeeds to B's rights as a holder in due course, cutting off the defense.'

"In the instant case, even though the Arnold notes were overdue, and even if Ruth knew when SNB indorsed to her that the Arnolds asserted a breach of contract defense, Ruth nevertheless succeeded to SNB's status as a holder in due course.... ('It is immaterial that the transferee of a note from a holder in due course took it after maturity ... or without payment of value ... or with notice of existing equities, infirmities or defenses....')" ( Citations omitted.) *Weast*, 299 Md. at 550–51, 474 A.2d at 909–10.

We similarly discussed the issue of illegality in the same context in our much earlier case of *Wilson v. Kelso*, 115 Md. 162, 80 A. 895 (1911). There we said in relevant part:

" 'Where a negotiable instrument is originally infected with fraud, invalidity, or illegality the title of the original holder being destroyed, the title of every subsequent holder which reposes on that foundation, *and on no other,* falls with it. *But if any subsequent holder takes the instrument in good faith, and for value, before maturity, he is entitled to recover on it....* ' '*[T]o constitute notice of an infirmity in an instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.*' "

*Wilson,* 115 Md. at 173, 80 A. at 899.

In an earlier case we were concerned whether certain statutes made gambling debts void, or merely voidable, terms which many of the foreign cases use to distinguish when a statute makes a transaction voidable and not subject to the defense of illegality, or void and subject to the defense of illegality. We said in *Gough v. Pratt,* 9 Md. 526 (1856), that:

"It has been said, by the appellee, the Circuit Court of the United States, in the case referred to, were wrong in holding a security given for a gambling debt to be void in this State. He contends the decision was based upon the idea that the statute of *9th Anne, ch. 14,* was then in force here, when, in fact, it was not....

"But we see nothing in this, or any previous law, which, either in express terms or by necessary implication, repeals the statute of *Anne....*

"In *Hook v. Boteter, 3 H. & McH. 348 [(1793)],* the statute of *9th Anne, ch. 14,* was recognized as being in force in Maryland....

"These authorities show, that the statute of *Anne* has been considered as included among the English statutes which have been adopted in Maryland. The first section of which provides, that 'all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever,'

given for gambling consideration, in whole or part, 'shall be utterly void, frustrate and of none effect.'

. . .

"The note for money won at play, in *Thomas v. Watson[, Taney, 302]*, [ ] is declared, in most explicit terms, to be '*void by law.*' Believing this to be true, of course we cannot adopt the view of appellee, that the single bill in this case, if given for money claimed to be won at cards, was not *void,* but only *voidable.*

. . .

"The two cases just mentioned, as likewise *Woodson v. Barrett[, 12 Va. 80, 2 Hen & Munf. 80 (Va.1808)]*, and *Skipwith v. Strother, [24* Va. 214*] [3 Rand. 214(Va.1825)]*, proceed upon the principle, that the security sued upon in each case was absolutely void in its creation, and could not be made valid by a subsequent transfer of it, even to a party having no knowledge of the defective consideration."

*Gough,* 9 Md. at 532–34. *Gough* was among the first cases we have found[15] in which we distinguished the difference between the effect of void and voidable. In order to be "illegal" in the context of applying as a valid defense by makers of the notes in holder in due course transactions, the alleged infirmity must actually be a void transaction.

Over time, when that infirmity is based upon the prohibitions in a statute, the doctrine of illegality has assumed (primarily in the cases of foreign jurisdictions) the position that the statute, itself, in specific language must declare actions done contrary to its provisions, absolutely void in order for a holder in due course to be subject to the defense of illegality. That, of course, is not the situation in the case *sub judice.*

---

**15.** *Gough* discusses some of the earlier English gambling cases, including those named in the quote above, as being consistent with the *Gough* holding.

*Kedzie and 103rd Currency Exchange, Inc., v. Hodge*, 156 Ill.2d 112, 189 Ill.Dec. 31, 619 N.E.2d 732 (1993), perhaps most clearly explains the concept and its applicability in the holder in due course concept. There Hodge had contracted with a plumber, Fentress, to perform work and apparently paid him in advance by check. The plumber negotiated the check and ultimately the Currency Exchange became a holder in due course. When the plumber failed to perform the work, Hodge attempted to stop payment on the check claiming that the transaction was illegal because it violated an Illinois statute. Litigation ensued. The Supreme Court of Illinois, opined, at some length, that:

> "Hodge asserted a defense provided by . . . the Uniform Commercial Code. . . . Under that section the claim of a holder in due course may be barred base on 'illegality of transaction.' Hodge contended Fentress was not a licensed plumber. . . . Hodge asserted that, because Fentress was in violation of the Illinois Plumbing License Law, his promised performance under the contract gave rise to the requisite 'illegality' to bar the Currency Exchange's claim for payment.
>
> . . .
>
> "The concern is whether noncompliance by Fentress with the Illinois Plumbing License Law gives rise to 'illegality of the transaction' with respect to the contract for plumbing services so as to bar the claim of the Currency Exchange, a holder in due course of the check. . . .
>
> "The issue of 'illegality' arises 'under a variety of statutes.' . . . Even so, it is only when an obligation is made 'entirely null and void' under 'local law' that 'illegality' exists as one of the 'real defenses' under section 3–305 [of the UCC (Ill.Rev.Stat. 1989, ch. 26, par. 3–305),] to defeat a claim of a holder in due course. In effect, the obligation must be no obligation at all. If it is 'merely voidable' at the election of the obligor, the defense is unavailable.
>
> . . .

"That the existence or absence of legislative declaration controls the issue was recognized by our appellate court in *McGregor v. Lamont* (1922), 225 Ill.App. 451, a case involving circumstances similar to those here. . . .

. . .

"The appellate court noted that the Illinois Securities Law did, indeed, make transaction for the sale of shares of stock void based on noncompliance with the Law's requirements. But the court noted that only the 'sale and contract of sale' of shares of stock were expressly made void, not instruments exchanged upon such contracts. Absent legislative declaration making such instruments void, the court declined to recognize a defense to McGregor's action for payment on the note.

"The same rule applies in New Jersey. . . .

"Several other jurisdictions also find reason to draw a distinction between the voidness of a negotiable instrument and the underlying contract or transaction upon which it is exchanged. . . . Although recognition of that distinction is not universal. [Citing California and Ohio intermediate appellate decisions.]

"A plaintiff is precluded from recovering on a suit involving an illegal contract because the plaintiff is a wrongdoer. . . .

"But a holder in due course is an innocent third party. Such a holder is without knowledge of the circumstances of the contract upon which the instrument was initially exchanged.[16] . . .

"The holder in due course concept is intended to facilitate commercial transactions by eliminating the need for 'elaborate investigation' of the nature of the circumstances for which an instrument is initially exchanged or of its drafting.

---

**16.** In the instant case respondent, a holder in due course, was without knowledge of a statutory provision in the District of Columbia in reference to the guardian's authority, and the Maryland statute permitted guardians to do just what the guardian did in executing and delivering the bill obligatory.

If 'illegality' means simply negation of the initial obligation to p ay, a holder in due course enjoys no more protection than a party to the original contract or transaction. The 'real' defense of 'illegality' is reduce to a 'personal' one.

"It is, therefore, not enough simply to conclude that the initial obligation to pay arising from a void contract or transaction is void. Negation of that obligation as between the contracting parties has little bearing on whether a holder in due course of an instrument arising from the contract or transaction should nevertheless be permitted to make a claim for payment.

. . .

"We therefore reaffirm, today, the view this court has consistently recognized in cases predating the UCC. Unless the instrument arising from a contract or transaction is, itself, made void by statute, the 'illegality' defense under section 3–305 is not available to bar the claim of a holder in due course." (Citations omitted.)

*Kedzie*, 156 Ill.2d at 114–21, 189 Ill.Dec. 31, 619 N.E.2d at 734–37.

In *Westervelt v. Gateway Financial Service*, 190 N.J.Super. 615, 464 A.2d 1203 (1983), that court opined similarly, as follows:

"This result is also wholly in keeping with existing authority. The fact that a negotiable instrument is rooted in an illegal transaction is normally no defense to enforcement by a holder in due course. However, an instrument rooted in an illegal transaction may be declared by statute to be therefore void and unenforceable. . . .

'In New Jersey, a holder in due course takes free and clear of the defense of illegality, unless the statute which declares the act illegal also indicates that payment thereunder is void.' "

*Westervelt*, 190 N.J.Super. at 622, 464 A.2d at 1207. *See Rhode Island Depositors Economic Protection Corp. v. Rignanese*, 714 A.2d 1190, 1198 (R.I.1998); *Colby v. Bank of Douglas*, 91 Ariz. 85, 88–89, 370 P.2d 56, 58–59 (1962), ("The

rule is well established that a negotiable instrument given in an illegal transaction is nevertheless enforceable in the hands of a holder in due course unless expressly made void by statute.... Where there is no statute making checks issued in payment of such withdrawals void, the defense of illegality is not available against a holder in due course."); *Solomon Nat. Bank v. Birch,* 111 Kan. 283, 207 P. 191, 192 (1922), ("[T]he jury's finding that the plaintiff did not purchase the notes in bad faith ... amounts to a decision that it was a holder in due course and therefore neither fraud nor illegality in the inception of the notes constituted a defense against it.").

## Summary

In the instant case there is no evidence that the original creditor, and certainly no evidence that the respondent here, negotiated the instrument with knowledge that the District of Columbia Court had not authorized the original transaction. The letters of appointment contained no restrictions on the powers of the guardian.

Moreover, Maryland law does not require the person dealing with a guardian to see to the proper application of proceeds that may belong to the guardianship estate nor does Maryland law normally impose limitations on the rights of persons dealing with a guardianship fiduciary that would affect their rights because of a breach of a fiduciary's duties to the guardianship estate.

In the case *sub judice,* whether the guardian had the authority to sign the deed of trust under the provision of the District of Columbia statute it relies upon here,[17] is no longer relevant. This is an action on the notes not an action foreclosing on the collateral security. Most of the cases pertaining to unauthorized signatures relate to the negotiation of bills oblig-

---

**17.** As we have indicated, there may be other District of Columbia statutory or rule provisions that might be relevant to the execution of promissory notes, but our attention has not been directed to those provisions, nor, as far as we have been able to discern, was the trial court advised that petitioner intended to rely on such other provisions.

atory, such as checks. Many of them relate to a person who has outward authority to sign checks, but exceeds that authority in the way the checks are endorsed or deposited. In some of those cases, if the party drawing the checks, i.e., the maker, acts in such a way that it aids the unauthorized signer in causing the bank to pay the check, the maker can be held to be negligent, and, if so, the bank generally is not required to reimburse the maker of the check. Here, it is the Guardian that failed to obtain the District of Columbia Court's approval of the transaction. It was the Guardian that signed, allegedly without the required approval, the deed of trust. It was the Guardian's neglect, or wrongful act, that created the situation. Now the same party, the estate of the ward, seeks to nullify its own action.

M & T did everything required of it to establish that title to the collateral (the real property) was in the name of the Guardian and that the notes were valid. As noted in the Court of Special Appeals' opinion,

> "The evidence showed that M & T Bank had purchased the Note and the Deed of Trust for value and conducted an appropriate due diligence investigation prior to the purchase. The investigation included a review of the title commitment, which reflected that the Property was vested in 'Cordelia A. Smith, Guardian of Clifton Dominick Smith, Minor Child.' M & T Bank's agents also reviewed the Deed of Trust, which was signed in an identical manner, and the Note, which was also signed that way. Further, they confirmed that they had a copy of the order appointing Ms. Smith as Guardian. Appellees' witness . . . testified to the conclusion of M & T Bank's agents that the loan was originated in accordance with the title requirements and that the documentation reviewed did not give rise to any concerns about the quality and integrity of the [original] transaction."

We agree with the intermediate appellate court that M & T Bank performed due diligence. We also note that pursuant to Maryland statutes, *supra,* and the common law, a Guardian

would normally have the authority to sign checks, execute promissory notes on behalf of the guardianship, and deposit the proceeds to the benefit of the Guardianship estate. What occurred here was that Ms. Smith, the then guardian, used the proceeds to benefit herself. It is this final step that, under Maryland law, was unauthorized.[18] But, Maryland law, *supra,* in such circumstances, does not require the holder in due course to see to the proper application of the loaned funds.

We noted in *Citizens Bank of Maryland v. Maryland Industrial Finishing Co., Inc.,* 338 Md. 448, 659 A.2d 313 (1995), an unauthorized endorsement case, as follows:

"In the present case, MIFCO [Maryland Industrial Finishing Co., Inc.] presents evidence that Pagani [the embezzler, an employee of MIFCO] deviated from her express authority in two ways. First, she deposited the checks in her personal account, rather than MIFCO's account. Second, she indorsed the checks by using only the MIFCO stamp without the deposit only stamp. We must consider whether the absence of the authority to do these two things makes her indorsement unauthorized despite the fact that she was expressly authorized to use the MIFCO stamp to indorse checks.

. . .

"A few courts in other states have held indorsements to be unauthorized because the agent later misappropriated the check, but we are not persuaded by their reasoning. The courts in both these cases seemed to assume, without discussion, that an indorsement and the later deposit are inseparably linked together, such that both are authorized or both are unauthorized." (Citations omitted.)

*Citizens Bank,* 338 Md. at 459–60, 659 A.2d at 318–19.

Similarly, in *Willey v. Mayer,* 876 P.2d 1260 (1994), the Supreme Court of Colorado concluded:

---

**18.** As far as the record reflects, at the time the note was executed and at the time the misuse of the money occurred, all parties, and the collateral security for the notes, were residents of, or situate in, Maryland.

"'An otherwise authorized signature on a negotiable instrument is not converted into an unauthorized forgery when an agent, authorized to sign negotiable instruments in his principal's name, abuses that authority by negotiating the instrument to a holder in due course for the agent's own personal benefit. The question of whether the agent was authorized to pledge an instrument as security for a personal loan is separate from the question of whether the agent was authorized to sign his principal's name to the instrument in the first instance.'"

*Willey,* 876 P.2d at 1265. *See also, Diamond Services Corp. v. Benoit,* 757 So.2d 23, 27 (La.App. 3 Cir.1999) ("As such, if Diamond Services is a holder in due course, the defense of mutual error as to the MC Mortgage note would be without merit."); *Lawyers Title Ins. Co., Inc. v. Novastar Mortgage, Inc.,* 862 So.2d 793, 799 (Fla.Dist.Ct.App.2003),

"BNC assigned the mortgage and the note to Aurora for value and transferred physical possession of the note to Aurora. Aurora took the note in good faith and without notice that it was overdue, had been dishonored, contained an unauthorized signature, had been altered, or of any claim or defense to the note on the part of any party. As such, Aurora was the holder in due course of the note."

*Lawyers Title,* 862 So.2d at 799.

## Conclusion

For the reasons we have stated, we hold that the note, and the Deed of Trust that is collateral security for the note, are separate instruments and the provision of the District of Columbia Code cited and quoted to this Court in petitioner's brief as prohibiting the execution of the Deed of Trust does not apply to the promissory note.[19]

We hold that, generally, guardians, have legal capacity to sue and be sued and have legal capacity to execute notes and

---

19. Even if such a District of Columbia provision existed applicable to bills obligatory, our conclusions in this case would be the same.

encumber the property of wards; and we hold, specifically, that the guardians in this case had the legal capacity to execute the bill obligatory at issue here. We further hold that alleged illegality based upon the violation of a statute does not make a holder in due course of a bill obligatory subject to the defense of illegality unless the statute itself, in express language, voids the specific transaction. We are aware of no such express statutory language applicable here.

For the reasons stated above, we shall affirm.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

HARRELL, J., dissents and files opinion in which BELL, C.J., and RAKER, J., retired, join.

Dissenting Opinion by HARRELL, Judge, which BELL, C.J., and RAKER, J., join.

I dissent. Cordelia Smith lacked legal capacity to bind the guardianship of Clifton Dominick Smith with regard to the deed of trust and deed of trust note at issue in this case. Accordingly, the guardianship possessed a valid defense to M & T Bank's collection efforts concerning the note. It is of no material consequence to my analysis that M & T Bank concededly is a holder in due course of the instrument.

## I.

A holder in due course takes an instrument subject to several "real" defenses, including lack of legal capacity of the maker, if it took with notice that a party had such a defense. Maryland Code (1975, 2002 Repl.Vol.), §§ 3–302, 3–305. Regarding the validity of an instrument, "[i]f an instrument is taken from a fiduciary for . . . value, the taker has knowledge of the fiduciary status of the fiduciary, and the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty . . . [n]otice of breach of fiduciary duty by the fiduciary is notice of the claim of the represented person."

Maryland Code, Commercial Law, § 3–307. Maryland law protects an individual represented by a guardian if the person dealing with the guardian has "actual knowledge or . . . reasonable cause to inquire whether a guardian is improperly exercising his [or her] power." Maryland Code (1974, 2001 Repl.Vol.), Estates & Trusts Article, § 13–219.[1]

As noted by the Majority opinion, it is beyond cavil that Cordelia Smith signed both of the instruments for the refinancing at issue here in her capacity as guardian and fiduciary under District of Columbia law, and M & T Bank, as successor in interest to the original payee/secured party of the instruments, had notice of this fact. Majority op. at 381–82, 952 A.2d at 243–44. The questions remaining are whether she did so in breach of her fiduciary duties and, if so, whether the breach gave rise to a valid "legal incapacity" defense on the part of Clifton Smith's guardianship against M & T Bank, as a holder in due course.

## II.

Petitioner argues that Smith lacked the legal capacity to sign the promissory note under District of Columbia law and that the Guardianship of Clifton Smith thus has a defense against the collection efforts of M & T Bank, even though the latter was a holder in due course. The Majority opinion dismisses this argument. According to the Majority, "[l]egal capacity and legal authorization are different concepts entirely" and legal capacity relates only to whether "Ms. Smith's appointment as guardian was in any way defective." Maj. Op. at 392, 400, 952 A.2d at 250, 254. In my view, the Majority too narrowly limits the meaning of the term "legal capacity" to legal status. The Comment to the Uniform Commercial Code (UCC) (adopted in Maryland) is more expansive. According to the Comment, one may advance a lack of legal capacity

---

1. In Maryland, every person is charged additionally with actual knowledge of any limitations endorsed on the letters of guardianship. Maryland Code (1974, 2001 Repl.Vol.), Estates & Trusts Article, § 13–219. In the present case, the District of Columbia equivalent of letters of guardianship included no explicit limitations.

where the act taken was ultra vires. Maryland Code (1975, 2002 Repl.Vol.), § 3–305(a)(1)(ii), Official Comment.

> Such incapacity is largely statutory. Its existence and effect is left to the law of each state. If under the state law the effect is to render the obligation of the instrument entirely null and void, the defense may be asserted against a holder in due course.

*Id.*; *see also* SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 60:44 (4th ed. 2000) (noting that an entity may lack legal capacity and have a defense to the enforcement of an instrument because its actions were ultra vires and that whether the defense voids the obligation of the entity depends on state law).[2]

We have defined "ultra vires" as " 'denot[ing] some act or transaction on the part of a corporation which, although not unlawful or contrary to public policy if done or executed by an individual, is yet beyond the legitimate powers of the corporation as they are defined by the statutes under which it is formed or which are applicable to it, by its charter or incorporation paper.' " *City of Frederick v. Pickett*, 392 Md. 411, 420 n. 4, 897 A.2d 228, 233 n. 4 (2006) (quoting *Penn. R. Co. v. Minis*, 120 Md. 461, 488, 87 A. 1062, 1072 (1913)). Although the term is employed most often with regard to private corporations, we have held that other artificial entities similarly may take actions fairly described as "ultra vires." *Id.* (noting that the doctrine of ultra vires applies to municipal

---

2. Specifically, the Comment notes that the legal capacity defense "covers mental incompetence, guardianship, ultra vires acts or lack of corporate capacity to do business, or any other incapacity apart from infancy." Maryland Code (1975, 2002 Repl.Vol.), § 3–305(a)(1)(ii), Official Comment. The first two of these indicate, as the Majority finds, that legal capacity implicates one's legal status. The Majority misses the clear implication of the latter situations that incapacity may mean also a lack of authority to act whether such an act is ultra vires, outside of corporate capacity, or some other incapacity. These latter situations further indicate that a guardian, although properly appointed, may lack legal capacity to act if an action taken is outside his or her authority, regardless of whether that action is to be regarded as "ultra vires." As I conclude that a guardian may commit an act that is describable properly as "ultra vires," this analysis is relegated to "footnote land."

corporations (citing *Boitnott v. Mayor of Balt.*, 356 Md. 226, 738 A.2d 881 (1999); *Inlet Assocs. v. Assateague House Condo. Ass'n*, 313 Md. 413, 545 A.2d 1296 (1988))); *Respess v. City of Frederick*, 82 Md.App. 253, 263, 571 A.2d 252, 257 (1990) (noting that a trustee city committed an ultra vires act by violating the limitations on a charitable trust); *Carroll Park Manor Cmty. Ass'n., Inc. v. Bd. of County Comm'rs of Frederick County*, 50 Md.App. 319, 437 A.2d 689, cert. denied, 292 Md. 595 (1981) (same for trustee county); *Bd. of Educ. of Carroll County v. Allender*, 206 Md. 466, 475–76, 112 A.2d 455, 460 (1955) (noting that an administrative agency may not perform on an ultra vires contract (citing *Coddington v. Helbig*, 195 Md. 330, 337, 73 A.2d 454 (1950); *Masson v. Reindollar*, 193 Md. 683, 69 A.2d 482 (1949); *Blundon v. Crosier*, 93 Md. 355, 361, 49 A. 1 (1901))). "Even in the case of a conventional trust, if the trustee goes beyond the scope of the power conferred by the deed or other instrument creating the trust, a court of equity will declare his acts to be ultra vires and legally inoperative." *Johnson v. Hines*, 61 Md. 122, 132 (1883).

Given that a conventional trust may act in a way that may be defined as "ultra vires," it logically may be inferred that a guardian's acts similarly may be defined as ultra vires where he/she acts "beyond [his/her] legitimate powers [as] defined by the statutes under which it is formed" or in the document creating it.[3] *Pickett*, 392 Md. at 420 n. 4, 897 A.2d at 233 n. 4 (quoting *Minis*, 120 Md. at 488, 87 A. at 1072). According to Maryland Code (1974, 2001 Repl.Vol.), Estates and Trusts Article, § 13–213, a guardian's power to act may be limited in the same sense as any other fiduciary under § 15–102 of the Article. Specifically, the powers of a guardian may be limited within the document creating it and/or by other pertinent law. *See* Maryland Code (1974, 2001 Repl.Vol.), Estates & Trusts Article, § 13–215 ("Any limitation on the powers of a guardian

---

**3.** "The relation between guardian and ward, like the relation between trustee and beneficiary, is a fiduciary relation." Restatement (Second) of Trusts, § 7 (1987).

contained in a will or other instrument which nominated a guardian should ordinarily be imposed by the court on the guardian."); *Id.* § 15–102(b)(2) ("Except as expressly limited in the governing instrument, the powers of a fiduciary under this section are in addition to those derived from common law, statute, or the governing instrument.").

As noted above, whether an act is ultra vires depends on the laws of the jurisdiction in which the subject entity was formed because those laws govern the entity and establish the limitations on its powers. *Pickett*, 392 Md. at 420 n. 4, 897 A.2d at 233 n. 4. We have ruled on more than one occasion that when the issue is the internal workings of a corporation, the law of the jurisdiction of incorporation governs the rights and responsibilities of the parties involved. *Tomran, Inc. v. Passano*, 391 Md. 1, 17, 891 A.2d 336, 346 (2006) (citing *Gilman v. Wheat, First Sec. Inc.*, 345 Md. 361, 370–71, 692 A.2d 454, 459 (1997); *N.A.A.C.P. v. Golding*, 342 Md. 663, 674, 679 A.2d 554, 559 (1996); *Stockley v. Thomas*, 89 Md. 663, 43 A. 766 (1899)). Similarly, with regard to trusts, the Court has held that a trust agreement and the actions that a fiduciary legitimately may take under that agreement should be construed applying the law of the jurisdiction in which the trust w as formed, *even if the trust property is within Maryland's boundaries* and the trust was formed elsewhere:

> The trust agreement should be construed according to the law of Illinois, not because the law of Illinois by its own force is operative in Maryland, but because by that part of the common law of Maryland known as the conflict of laws the construction of the trust agreement depends upon the law of Illinois. The only law in force in Maryland is its own law (including the laws of the United States). Within constitutional limitations, the State of Maryland 'theoretically could draw a line of fire around its boundaries' and recognize nothing concerning property within its boundaries that happened outside. 'But it prefers to consider itself civilized and to act accordingly.' *Direction Der Disconto-Gesellschaft v. United States Steel Corporation*, 267 U.S. 22,

28, 45 S.Ct. 207, 208, 69 L.Ed. 495; Restatement, Conflict of Laws, § 1.

*Staley v. Safe Deposit & Trust Co. of Balt.,* 189 Md. 447, 454, 56 A.2d 144, 147 (1947).

## III.

If Smith lacked legal capacity to act under the rules and laws of the District of Columbia, it still must be determined whether the guardianship may be bound by Ms. Smith's unauthorized act. To answer that, this Court should apply the rules and laws of the District of Columbia. The Majority concludes that M & T Bank did everything required of it under Maryland law to fulfill its due diligence obligation with regard to Smith' authority to act for the guardianship. According to the Majority opinion, "[i]n the instant case there is no evidence that the original creditor, and certainly no evidence that the respondent here, negotiated the instrument with knowledge that the District of Columbia Court had not authorized the original act. The letters of appointment contained no restrictions on the powers of the guardian." Maj. Op. at 407, 952 A.2d at 259. The implication of the Majority's statement, however, is that the guardianship may not be bound by Smith's actions had the guardianship papers contained restrictions indicating the necessity of court approval before the actions at issue could be taken. In that circumstance, the guardianship could not have authorized Smith to act on its behalf and M & T Bank could not have believed reasonably that Smith possessed authority to execute the deed of trust and promissory note in her capacity as guardian. Additionally, the guardianship (through Mr. Hand) properly may assert the defense that Smith lacked the legal capacity to bind the guardianship, a defense that would preclude any responsibility on the part of the guardianship for the acts of Ms. Smith taken in its name, but without legal capacity.

In this case, the court documents creating the guardianship did not limit Smith's legal capacity to act in the name of the guardianship, but that does not mean that Maryland should turn a blind eye to District of Columbia law that limited her

capacity. In the special circumstances involving a guardianship, this Court should recognize and apply the laws and rules of the place of formation that affect whether Smith had authority, and therefore legal capacity, to bind the guardianship. A guardianship is an entity of court rule and statute. Its existence is the fruit of a recognition by the approving state that its minors or disabled persons ought to be protected from those who would seek to deal with them. The statutes governing the power of a guardian in both Maryland and the District of Columbia recognize that the authority of a guardian to act with regard to the guardianship must have boundaries, and the courts of these jurisdictions are charged with establishing the bounds. As discussed by the Majority opinion, Maryland's and the District of Columbia's statutes vary in their method of protection. In Maryland, limitations on the ability of a guardian to sign a deed of trust and accompanying promissory note would appear normally in the letters of guardianship; in the District, a court must approve such an action each time it is proposed. M & T Bank, as holder in due course, acquired the deed of trust and accompanying promissory note with knowledge that Smith purported to sign those documents in her capacity as guardian under District of Columbia law. Certainly, there was "reasonable cause to inquire" on the part of M & T Bank as to the rules and laws governing the guardianship in the jurisdiction of its creation, because those laws govern the relationship of the guardian to the guardianship, to ensure that Smith was not "improperly exercising [her] power." Maryland Code (1974, 2001 Repl. Vol.), Estates & Trusts Article, § 13–219. After all, we charge one dealing with a Maryland-formed guardianship with knowledge of the laws of Maryland. *See* Maryland Code (1974, 2001 Repl.Vol.), Estates & Trusts Article, § 13–219 ("[E]very person is charged with actual knowledge of any limitations endorsed on the letters of guardianship"); *Id.* § 15–102 (enumerating the powers that a fiduciary, including a guardian, may perform without application to, approval of, or ratification by a court).

## IV.

The Majority opinion reasons that even applying District of Columbia law to the transaction at issue, "bills obligatory which are secured by mortgages or deeds of trust are separate instruments and can be proceeded on separately." According to the Majority, "[t]he relevant District of Columbia statute referenced by petitioner apparently relates only to mortgages or other instruments of conveyance." Maj. Op. at 387, 952 A.2d at 247. Thus, there is "no impediment for the action filed by respondents in the present case to enforce the repayment of the promissory note at issue here." *Id.* at 387, 952 A.2d at 247. This view is not supported, however, by the regulatory scheme afforded guardianships in the District of Columbia, which required that Smith obtain court approval to sign either the deed of trust or the deed of trust note. The Majority ignores (in fact fails even to cite) the case principally relied on by Petitioner. In *Easterling v. Horning,* 30 App. D.C. 225 (1908), the District of Columbia appellate court discussed statutes and rules that limit the authority of a guardian. The court explained that the scheme denies a guardian the legal capacity to sell or encumber real property. *Easterling,* 30 App. D.C. 225; *see* District of Columbia Code §§ 21–155, 21–157. Further, the scheme, as Petitioner noted in its brief, denies guardians the legal capacity to "dispose of the ward's property or encumber it in any way without order of the court." *Easterling,* 30 App. D.C. 225; *see* District of Columbia Rule of Probate Court 221(f). Taken together, the District's rules and statutes are intended to render void exactly the type of action taken by Smith in this case. *Easterling,* 30 App. D.C. 225 ("[T]hese statutes and rules, taken as a whole, render void any attempt by a guardian to pledge or otherwise dispose of the title to property which the law says is in the infant, in any other way than that provided therein."). Certainly, by signing a promissory note intended to hold liable Clifton Smith, as ward, Cordelia encumbered Clifton's property without order of the court. As noted by the District of Columbia court "it was the duty of the guardian to preserve and protect [the ward's] estate, saving it for her use and

maintenance, and not to dispose of any portion of it, [according to the District of Columbia guardianship scheme,] unless authorized to do so by the court." *Easterling*, 30 App. D.C. 225. According to these principles, embodied in the laws and rules controlling a guardianship created in the District of Columbia, Cordelia Smith's execution of the note and deed of trust documents in the name of the guardianship should be declared a nullity as to the guardianship.

In sum, Cordelia Smith lacked the legal capacity to bind the guardianship of Clifton Smith as to the promissory note later acquired and held in due course by M & T Bank. This lack of legal capacity, arising out of the principles of guardianship embraced under Maryland and District of Columbia law, should render void any attempt made by Ms. Smith to bind the guardianship to re-pay M & T Bank.[4] "Within constitutional limitations, the State of Maryland theoretically could draw a line of fire around its boundaries and recognize nothing concerning property within its boundaries that happened outside. But it prefers to consider itself civilized and to act accordingly." *Staley*, 189 Md. at 454, 56 A.2d at 147 (internal quotation omitted). For these reasons, I am unable to join the Majority opinion and, accordingly, would reverse the judgment.

Chief Judge BELL and Judge RAKER have authorized me to state that they join in this dissent.

---

**4.** Under the holding announced today, a newly appointed guardian may walk briskly from the courthouse in the District of Columbia, hop on the Metro, and be whisked away to Maryland, all the while any statutory restriction on his or her authority evaporating en route. The liberal protections afforded the ward and the ward's assets apparently stop at the border.